# SERVICE AGREEMENT

This Agreement is between **Chumash Casino Resort Enterprise** ("*Client*"), located at 3400 E. Hwy 246, Santa Ynez, CA 93460 United States and **Ceridian Corporation** ("*Ceridian*"), located at 3311 East Old Shakopee Rd., Minneapolis, MN 55425 United States each of which may be referred to in the singular as "Party" or in the plural as "Parties".

**1.    DEFINITIONS AND INTERPRETATION.** As used in the Agreement:

**1.1    "Affiliate(s)"** means a person that directly or indirectly controls, is controlled by, or is under common control with, a Party, where "control" means the possession, directly or indirectly, or the power to direct or cause the direction of the management policies of a person, whether through the ownership of voting securities, by contract or otherwise;

**1.2    "Agreement"** means this agreement, and all Schedules and Exhibits hereto;

**1.3    "Business Day"** means any day of the year other than a Saturday, Sunday or a Statutory or civic holiday in the Territory(ies), but only to the extent such term refers to a Service being delivered in respect of such Territory;

**1.4    "Ceridian Contractor"** means any person who is not a Party or an employee of Ceridian, who Ceridian contracts or otherwise engages to assist with or perform any part of the Services;

**1.5    "Ceridian Property"** means, collectively: (i) any and all systems, hardware, software, networks, online content, applications, source codes, specifications, templates, modules, devices, equipment, documentations or other property owned, licensed, leased, produced, designed, created or used by Ceridian as of the Effective Date or thereafter, whether for purposes of providing the Services pursuant to the Agreement or for any other purpose; (ii) all Confidential Information of Ceridian; (iii) all Materials; and (iv) any and all Intellectual Property in any of the foregoing or related thereto;

**1.6    "Client Data"** means any data of Client supplied by or on behalf of Client to Ceridian hereunder, or any such data created as a result of the processing of such data, included any data contained or embodied in Ceridian Property;

**1.7    "Confidential Information"** means any information identified by either Party and/or its Affiliates as "Confidential" and/or "Proprietary", or which, under the circumstances, ought to be treated as confidential or proprietary, including non-public information related to the disclosing Party's (and/or an Affiliate's) business, employees, service methods, software, documentation, financial information, prices and product plans;

**1.8    "Effective Date"** has the meaning set forth in Section 3.1 titled "Term";

**1.9    "Fees"** means the fees payable by Client to Ceridian for the Services, as contemplated in Section titled "Fees" below, and/or any corresponding Pricing Schedule;

**1.10    "Including"** and **"Includes"** shall, wherever they appear in the Agreement, be deemed to be followed by the statement "without limitation", and neither of such terms shall be construed to limit any words or statement which it follows to the specific or similar items or matters immediately following it;

**1.11    "Intellectual Property"** means all intellectual property rights (including all copyrights, patents, trademarks, trade secrets, industrial designs and know how) and all applications, continuations, extensions, notices, licenses, sublicenses, agreements and registrations thereof in any jurisdiction;

**1.12    "Licensed Property"** means such Ceridian Property and Third Party IP as may be required for use directly by Client for the sole purpose of allowing Client to receive and use the Services internally;

**1.13    "Materials"** means all materials, forms, brochures, tip sheets, posters, and online content furnished by Ceridian to Client, and any derivatives thereof;

**1.14    "Parties"** means collectively Client and Ceridian, and each is a "Party";

**1.15    "Personal Information"** means information about an identifiable individual and which constitutes information governed by any applicable privacy or data protection law, statute or regulation;

**1.16    "Pricing Schedule"** means the pricing document attached hereto (or attached to a Service Exhibit, or Statement of Work, if executed subsequently an amendment hereto) setting forth the applicable prices and fees to be paid by Client;

**EXHIBIT 1**

**1.17** **"Professional Services SOW" or "SOW"** means a written Statement of Work to be signed by both Client and Ceridian, setting forth in detail the work, services and deliverables to be provided by Ceridian in respect of any professional services work;

**1.18** **"Service Exhibit(s)"** means the exhibit(s) attached hereto or executed subsequently describing the Service(s) to be delivered by Ceridian to Client;

**1.19** **"Service Term"** means the term for a particular Service, as may be expressly set forth for in the applicable Service Exhibit;

**1.20** **"Services"** means, collectively, the services and any Materials and/or other deliverables to be supplied with the services provided by Ceridian to Client under the Agreement, as such services are more particularly described in a Service Exhibit or an SOW, and each is a "Service";

**1.21** **"Service Start Date"** means, in respect of a Service, the actual date on which Ceridian commenced providing such Service. The anticipated Service Start Date will be identified in the applicable Service Exhibit or Pricing Schedule;

**1.22** **"Taxes"** means all sales taxes, value added taxes, goods and services taxes, business transfer taxes, withholding taxes or any other taxes now or hereafter levied or imposed by any governmental authority by reason of or with respect to the provision of the Services to Client, but, for certainty excluding Ceridian's taxes for income derived under the Agreement; and

**1.23** **"Territory"** means the territory or territories in respect of which a Service is to be delivered, as identified in the applicable Service Exhibit.

**2.** **SERVICES**

**2.1** **General**

**2.1.1** Ceridian shall provide the Service(s) to Client, in the respective Territory or Territories as more particularly set forth in the Service Exhibit(s). Client acknowledges and agrees that certain Services or parts thereof may be subcontracted by Ceridian to Ceridian Contractors, including Affiliates of Ceridian. However, regardless of any such subcontract, Ceridian shall remain solely liable for performance of the Services and all of its obligations hereunder.

**2.1.2** All Services are provided to Client on the strict condition that they are used for Client's own internal business use and not for re-sale by Client or for any use by Client that would constitute providing a service for third parties. However, and notwithstanding the above it is agreed that the Services may be used by Client's Affiliates provided that:

(i)   the Services are used by Client and/or its Affiliates only within the respective Territory in which Ceridian has agreed to provide such Service;

(ii)   Client shall remain liable for the acts and omissions of all of its Affiliates as if the acts and omissions were acts and omissions of Client;

(iii)   any loss or damage arising in connection with the Services incurred by such Client Affiliate shall be actionable by Client as if such loss and damage were incurred by Client, but shall not be actionable by Client's Affiliate directly against Ceridian or any Ceridian Contractor;

(iv)   such Affiliate shall be deemed to have agreed to comply with all covenants and obligations on the part of Client herein, and agreed that Ceridian shall be entitled to all of the rights and benefits granted herein, as if such Affiliate has been a signatory to the Agreement;

(v)   Client shall be jointly and severally liable with the Affiliate for any and all Fees and other charges, arising as a result of such Affiliate's use of the Services, including any consequent increases in transactions, user numbers, set-up requirements, data records or Service provision; and

(vi)   as a condition of allowing the Affiliate to access or continue to use the Services, Ceridian may, but shall not be obliged to, require the Affiliate to execute such documentation as reasonably required by Ceridian to confirm the Affiliate's agreement to the terms hereof.

**2.1.3** Ceridian will use all reasonable efforts to supply the Services in conformance with the dates and times set forth in the Service Exhibit, including the Service Start Date. The Parties acknowledge and agree that all dates and times for performance of any obligations in the Service Exhibits have been estimated in good faith, and Client shall not be entitled to any compensation (and for certainty, in no event shall Ceridian or any Ceridian Contractor be liable, whether in tort, contract or otherwise, to Client) for any damage or loss

whatsoever resulting from a failure to meet such estimated time frames; provided, however, that Client shall not be responsible to make any payments to Ceridian during any such delay period caused by Ceridian.

2.1.4  Without limiting any other rights Ceridian may have hereunder, after a period of six (6) months of Client's non-use of one or more Service(s), customization or other work contracted by Client hereunder ("Unused Service(s)"), Ceridian shall have the right to terminate the Unused Service(s) as set forth in this section. "Non-use" means failure by Client to implement Services within six (6) months of the timeline agreed to in writing by the Parties for each of the Unused Services, or if no timeline has been established, then six (6) months after the Implementation kick off meeting for the Unused Service. . Ceridian shall provide Client with thirty (30) days prior written notice of its intent to terminate the Unused Service(s). Client may notify Ceridian in writing of its intent to implement the Unused Service within a period not to exceed an additional three (3) months from the date of Ceridian's notice. In the event Client declines the opportunity to re-engage, or in the event Client fails to respond within the thirty (30) day notice period provided by Ceridian, Ceridian shall have the right to terminate the Unused Service(s) at any time after the thirty (30) day period has expired.

## 2.2    Professional Services

2.2.1  Any work or services to be delivered by Ceridian which are not described in a Service Exhibit shall be described in a Professional Services SOW.  However, and for the avoidance of doubt, if for any reason Client avails itself of work or services are provided by Ceridian which are not specifically identified in a Service Exhibit or Professional Services SOW, such work will be provided subject to the terms and conditions of the Agreement, and at Ceridian's then current price for such additional work or services. The scope of services in a Professional Services SOW may be amended from time to time upon mutual agreement in writing of both parties.  Ceridian shall assign employees or subcontractors qualified to perform such professional services work, who shall exercise due professional care and competence in the performance of such Services.

2.2.2  Client shall: (i) furnish reasonably qualified personnel to work with Ceridian personnel in the execution of each SOW; (ii) supply adequate resources and information as mutually agreed upon; (iii) notify Ceridian in writing of any request for changes to the SOW; (iv) review and accept or reject each deliverable within ten (10) Business Days of notification by Ceridian of completion of such work, or within such other time frame (and /or in such manner) as may be expressly contemplated in a SOW, such acceptance not to be unreasonably withheld.  Subject to any express acceptance criteria to the contrary set forth in an SOW, each deliverable will be deemed to be accepted by Client on the tenth (10th) Business Days after notification by Ceridian of completion of such work, unless Client has provided Ceridian (within such 10 Business Day period) with written notice rejecting such work and specifying the manner in which such the deliverable is defective; and (v) during the term of the Agreement and for one year thereafter, not to intentionally solicit the services of any Ceridian employees who were involved in the performance of such Services.

## 2.3    Additional Services

2.3.1  Changes in the scope of Services, made at Client's request or as a result of events beyond Ceridian's reasonable control, may require changes to the Fees and estimated completion dates.  Any change in the scope of Services must be agreed to in writing by both Parties before Ceridian performs work that would cause the cost estimate for the project to be exceeded.  In the event that performance on the part of either Party is delayed or suspended as a result of circumstances beyond its reasonable control and without its fault or negligence, then the period of performance of the applicable Service Exhibit shall be extended to the extent of any such delay and neither Party shall incur any liability to the other Party as a result of such delay or suspension.   If any delays in Ceridian's performance occur as a result of Client's failure or untimely performance, the period of performance shall be extended to the extent of any such delay and Ceridian shall not incur any liability to Client as a result of such delay.  If such delays last for thirty (30) days or more, Ceridian shall be entitled to terminate this Service Exhibit by giving Client written notice, such termination to be effective on the date indicated in the notice.

## 3.    TERM AND TERMINATION

**3.1    Term.** The Agreement will become effective when signed by Client and by Ceridian (the "*Effective Date*"), and shall continue until terminated in accordance with the terms hereof.  It will continue for an initial term of 36 months beginning with the Effective Date (the "Initial Term") and shall continue thereafter until terminated by either Party upon 90 days prior written notice.  Client's obligation to pay all Fees that have accrued as at the Effective Date of the expiration or termination of the Agreement or a Service Exhibit will survive any expiration or termination.

**3.2    Termination.** The Agreement (or at the option of the Party exercising the termination right, only the affected Service Exhibit, in the case of failures to pay or perform, as described below), may be terminated as follows:

3.2.1   immediately by Ceridian without further notice to Client, if Client fails to pay any Fees when due, and such failure continues for a period of seven (7) Business Days after Ceridian provides Client with written notice of such breach;

3.2.2   by either Party if the other Party fails to perform, or is otherwise in default of, any one or more of its material obligations under the Agreement (except failure by Client to pay Fees, when the provisions of the preceding subsection shall prevail), and fails to remedy such failure within thirty (30) days after receiving written notice of default from the non-defaulting Party specifying the particulars of the breach and expressly referring to the threat of termination under this subsection,;

3.2.3   immediately by either Party if the other Party is, or is deemed for the purposes if any law to be, unable to pay its debts as they fall due or insolvent, or any corporate action, legal proceedings or other procedure or step is taken against Client in relation to or with a view to winding-up, dissolution, administration, reorganization (in each case, whether out of court or otherwise) in respect of Client / Affiliate or any of its assets, or any analogous procedure or step is taken in any jurisdiction; or

3.2.4   upon written notice by either Party, if the Initial Term or Service Term for every Service has expired (without being renewed or continuing in accordance with the terms of the Service Exhibit), or otherwise been terminated as permitted in accordance with the terms of the Agreement.

**3.3    Early Termination Fee.** Client may only terminate the Services without cause prior to the expiration of the initial Service Term upon payment of an early termination fee as described below, and by furnishing at least ninety (90) days' prior written notice to Ceridian.  If Client terminates the Service pursuant to this section without cause, Client shall be responsible to pay to Ceridian, in addition to the Fees payable up to and including the effective date of termination of the Service (including all One Time Fees for work performed up to and including the date of termination), an early termination fee equal to the average monthly Recurring Fees (computed based on the Recurring Fees for Services provided to Client during the three (3) month period preceding cancellation, or the Services have not as yet commenced, then based on estimated annual fees as shown in the Pricing Schedule, pro rated for 3 months), multiplied by the number of whole or partial months between the date that the cancellation is effective and the expiration date of the Initial Term, less a discount equal to 25%.

**4.    FEES AND PAYMENT**

**4.1    Fees.** Client will pay the Fees plus all applicable Taxes, in the amounts and in accordance with the payment terms and processes set forth in the Service Exhibits, Professional Services SOW and/or Pricing Schedule. Any Taxes imposed on any transactions between Client and Ceridian contemplated under the Agreement shall be the subject of an additional charge and shall be shown separately on any invoice or similar document together with the required tax registration numbers, and paid by the party at the same time as the party pays the amount in respect of which such Taxes are payable. All Fees (and applicable Taxes) for Services provided within a Territory will be invoiced to, and payable by, the local Client entity located in such Territory. However, in the event that Services are invoiced to a Client entity from a Ceridian entity outside of the Territory in which Client entity receiving such Services is located, Client entity shall remit payment to the Ceridian entity issuing the invoice and shall be solely responsible to self-assess for all Taxes relating to such Services to the extent such Taxes are not paid to Ceridian.

**4.2    Annual Fee Increase.** After the Initial Term of the Agreement, all Fees are subject to annual increases in an amount not to exceed the annual increase in the Employment Cost Index: Total Compensation: All Workers: Civilian, Not Seasonally Adjusted (ECI), as published by the Bureau of Labor Statistics, US Department of Labor the first such increase to be calculated and effective on the third anniversary of the Service Start Date.

**4.3    Expenses.** Client shall, in addition to all Fees, reimburse Ceridian for all reasonable expenses (in accordance with Ceridian's then current expense policy) incurred in connection with the implementation and provision of the Services, including travel, accommodation and meals. Ceridian shall advise Client prior to incurring such expenses and obtain Client's prior approval for same. Travel and subsistence will be charged from the location from which the respective Ceridian employee performing the work is based, to the required place of work, and Ceridian will endeavor to direct staff for most appropriate use of skills and economy of expense.

**4.4    Late Fees.** Ceridian may charge a late payment fee in the amount of 1 1/2% per month for late payments made by Client. Client agrees to pay late payment fees including all costs of collection (including reasonable legal fees and expenses). If Client fails to comply with any of the terms of payment for more than seven (7) Business Days after receipt of a written demand for payment, Ceridian may, in addition to any other right available to it, suspend performance of all or any part of its Services.

**4.5     Currency.** All Fees are payable in the currency stated in the relevant Pricing Schedule and shall be remitted to Ceridian in that currency. If remitted in another currency and/or from outside the Territory, sufficient funds must be remitted such that the net sum received by Ceridian in the requisite currency after foreign exchange and other bank charges is that stated on the relevant invoice. Ceridian will be entitled to invoice Client for any shortfall.

**5.     CONFIDENTIALITY AND PRIVACY**

**5.1     Non-Disclosure.** Neither Party shall disclose Confidential Information of the other Party except as permitted in accordance with the terms of the Agreement. The receiving Party shall use the same degree of care as it uses to protect its own Confidential Information of like nature, but no less than a reasonable degree of care, to maintain in confidence the Confidential Information of the disclosing Party. The foregoing obligations shall not apply to any information that (i) is at the time of disclosure, or thereafter becomes, part of the public domain through a source other than the receiving Party; (ii) is subsequently learned from a third party that does not impose an obligation of confidentiality on the receiving Party; (iii) was known to the receiving Party at the time of disclosure; (iv) was generated independently by the receiving Party; or (v) is required to be disclosed by law, subpoena or other legal process. Ceridian may transfer Client's Confidential Information to a governmental agency or other third party to the extent necessary for Ceridian to perform its obligations under the Agreement or if Client has given Ceridian written authorization to do so.

**5.2     Compliance.** Ceridian and Client each hereby represent that they have taken commercially reasonable steps to ensure that they will at all times be in compliance with all applicable laws relating to privacy and the collection, use and disclosure of Personal Information relating to the Services. Ceridian and Client each hereby represent that any Personal Information provided by it to the Other Party under the Agreement has been and shall be collected, transferred and/or disclosed in compliance with such privacy laws (including obtaining the proper consent where applicable).

**5.3     Use and Retention.** Ceridian acknowledges that it is receiving Personal Information in connection with the performance of Services it provides under the Agreement. Ceridian shall not use or disclose Personal Information without Client's permission for any purpose other than fulfilling its obligations under the Agreement.   Ceridian acknowledges that Client determines the purpose and means of the processing of the Personal Information delivered to Ceridian under the Agreement.  As such, Ceridian shall only process such Personal Information in accordance with instructions received through Client, and Client hereby gives Ceridian permission to use, transfer and process such Personal Information obtained by Ceridian in connection with the Services as necessary to perform the Services (as used in this Section, the "*Purpose*").   Personal Information will not be retained for longer than necessary to accomplish the Purpose for which it was collected, and Ceridian will correct such Personal Information as directed by Client.  In addition, Ceridian will promptly notify Client of any request for access to Personal Information received by Ceridian hereunder, unless prohibited by law.

**5.4     Personal Information.** Client acknowledges and agrees that Ceridian may transfer or disclose such Personal Information to its employees or other representatives and Ceridian Contractors, provided that such transfer or disclosure is limited to those parties who Ceridian reasonably requires to access such information for the Purpose, provided that such parties have confidentiality obligations with respect to the Personal Information at least as protective of the obligations contained herein, whether by contract or operation of law.

**6.     INTELLECTUAL PROPERTY AND LICENSED PROPERTY**

**6.1     Ownership of Intellectual Property.** Each Party shall remain the owner of all Intellectual Property it owns prior to the Effective Date and that which it creates in the performance of its obligations under the Agreement. As between the Parties and *vis à vis* any third party, Ceridian is and shall remain the sole and exclusive owner of all Ceridian Property and any and all components thereof, whether owned on the Effective Date or acquired thereafter, and Client is and shall remain the sole and exclusive owner of Client Data and any and all components thereof. Forthwith upon the expiration or termination of the Agreement or Service Exhibit, as the case may be, each Party shall forthwith return to the other Party, all such property in its possession or control.

**6.2     Grant of License.** Ceridian hereby grants to Client, starting on the Effective Date and continuing for so long as required for a Service, a non-exclusive, personal, non-transferable, non-assignable and revocable license to use internally the Licensed Property within the Territory, subject to and in accordance with the following terms:

   **6.2.1** Client shall not alter, destroy or remove any copyright, patent, trade-mark, or other proprietary or legal markings contained within the Licensed Property;

   **6.2.2** Client shall not modify, merge, copy, disseminate, display, disassemble, reverse engineer, tamper with, or otherwise attempt to decrypt or derive the source code, any trade secrets or any proprietary information of the Licensed Property, or create any applications whatsoever or any derivative works thereof;  .

6.2.3  the Licensed Property is licensed only for Client to receive and use the Services, and without limitation, Client shall not use it in any manner that would be illegal, offensive or damaging to Ceridian or any third party; and

6.2.4  Client shall not transfer, sublicense, charge or otherwise deal in or encumber the Licensed Property or make the Licensed Property available to any third party, and any attempt to do so shall be null and void and shall constitute a material breach of the Agreement.

**6.3   Indemnity for Infringement.**  Ceridian will indemnify and hold Client harmless from and against any and all claims alleging that the Services and any Intellectual Property furnished by Ceridian violate any third party's United States or Canadian patent, trade secret or copyright, except to the extent that such claims arise from Client's modification of the Services or Intellectual Property or from Client's use of such Services in excess of the provisions set out in this Section.  However, Ceridian's liability hereunder shall be conditional upon Client providing Ceridian with timely written notice of any such claim or threat thereof, and the full and exclusive authority for, and information for and assistance with, the defense and settlement thereof.  If such claim has occurred, or in Ceridian's opinion is likely to occur, Client agrees to permit Ceridian, at its option and expense, either to procure for Client the right to continue using the Intellectual Property, or replace or modify the same so that it becomes non-infringing.  If neither of the foregoing alternatives is reasonably available, Ceridian may immediately terminate its obligations (and Client's rights) under the Agreement with regard to such Intellectual Property (if the Services are deliverable without such Intellectual Property) or terminate the Agreement in its entirety (to the extent Ceridian is not able to provide the Service without such Intellectual Property).

## 7.   DISPOSITION OF DATA

**7.1   Record Retention.**  Except as otherwise expressly provided for in a Service Exhibit, Ceridian will not be responsible for storing copies of Client's records when Ceridian in its sole discretion no longer requires such information in order to provide Services to Client, and without limitation, Client shall be responsible for retaining its own business records according to the schedules established by governmental authorities for Client.   Client will reimburse Ceridian for the costs of producing any information in Ceridian's possession or control relating to Client's business or employees that Ceridian produces in response to a Client request or court order.  Unless otherwise required by law, upon termination of the Agreement, Ceridian may dispose of Client's records and data in accordance with Ceridian's data retention policy in effect from time to time (but in compliance with all privacy laws as contemplated in Section titled "Confidentiality and Privacy" hereof).  In the case of termination of one but not all Services, Ceridian may dispose of Client's records and data not related to the remaining Service(s), unless otherwise required by law, in accordance with Ceridian's data retention policy in effect from time to time (but in compliance with all privacy laws as contemplated in Section titled "Confidentiality and Privacy" hereof).  In no event will Ceridian destroy any file containing the only copy of Client's then current payroll or human resource information without providing Client with reasonable notice of its intention to do so and a reasonable opportunity to transfer or arrange for the transfer of such file to Client or a third party.

## 8.   REPRESENTATIONS AND WARRANTIES

**8.1   Ceridian's Representations and Warranties.**  Ceridian represents and warrants to Client as follows:

8.1.1  it has all the requisite authority to enter into the Agreement and is lawfully entitled to supply the Services to Client in the manner contemplated herein;

8.1.2  it will use all reasonable skill and care in accordance with industry practice in the course of performing the Agreement; and

8.1.3  it will comply with all applicable laws and regulations relating to the provision of the Services in the Territory.

**8.2   Client's Representations and Warranties.**  Client represents and warrants to Ceridian as follows:

8.2.1  it has all the requisite authority and is lawfully entitled to enter into the Agreement; and

8.2.2  it will comply with its obligations as set out in the Agreement, including any associated Service Exhibits and will provide all reasonable cooperation to Ceridian in the performance of the Agreement.

**8.3   Exclusions.**  The express and limited representations and warranties provided in the Agreement comprise all of the representations and warranties made with respect to the Services, products, Intellectual Property and other items provided, furnished, licensed, leased or otherwise made available or performed for Client by Ceridian pursuant to or in relation to the Agreement.  Any further or other warranties or conditions, whether express or implied, are expressly excluded to the extent permitted by law.  Without limiting the foregoing, Ceridian does not warrant that, to

the extent the Services require computer software or Services delivered using computer software, the provision of those Services will be entirely error free or will run uninterrupted.

## 9.    LIMITATIONS OF REMEDIES

**9.1    Limitation of Liability.**  Subject to Section titled "Damages" below, to the maximum extent permitted by applicable law, Client agrees that Ceridian's total maximum aggregate cumulative liability (including that of Ceridian's Affiliates and Ceridian Contractors) to Client, its Affiliates and other related parties (collectively in this Section referred to as the "*Aggrieved Parties*") for all past, present and future claims, demands, actions, causes of actions, requests, lawsuits, judgments, damages, costs, expenses, prejudices or losses (collectively in this Section referred to as the "*Claims*") in relation to or arising under the Agreement (whether for breach of contract, strict or statutory liability, negligence or any other legal or equitable theory) shall be limited to the Aggrieved Parties' actual direct damages and shall not, under any circumstances, exceed, in the aggregate, for all Claims past, present and future, the greater of: (i) the total amount paid by Client (and any Affiliates) for the defective Services causing the damages during the 12 months immediately preceding the loss; or (ii) $100,000.  This remedy shall be the Aggrieved Parties' sole and exclusive remedy against Ceridian, any Ceridian Affiliate and Ceridian Contractor.

**9.2    Damages.**  To the maximum extent permitted by applicable law, and notwithstanding anything to the contrary contained in the Agreement, neither Ceridian nor any of its Affiliates shall be liable for any indirect, consequential (including damages for business interruption or loss of business information or data), special, punitive, exemplary or incidental damages, claims by third parties, or damages for loss of profits, goodwill, anticipated savings or revenues, arising in relation to or under the Agreement, even if advised of the possibility of such damages or if the possibility of such damages was reasonably foreseeable.

**9.3    Claims.**  Notwithstanding any other provisions of the Agreement, nothing shall exclude or limit either Party's liability under section 9.1 or damages under section 9.2 for Claims relating to the following:

   9.3.1   death or personal injury resulting from that Party's negligence;

   9.3.2   that party's fraud or statements made fraudulently;

   9.3.3   any Claim for indemnity by Client under Section titled "Indemnity for Infringement"; and

   9.3.4   any acts or omissions for which the governing law prohibits the exclusion or limitation of liability.

## 10.    CHANGES

**10.1    Changes to Legislation.**  In the event of a change to any federal, state, provincial or other applicable law or regulation affecting the Services, or any reasonably unforeseen change materially affecting the cost of providing the Services, Ceridian may make changes to the Agreement with thirty (30) days' prior written notice to Client.  If, upon notification of the change, Client elects not to continue the Services, then notwithstanding anything to the contrary in the Agreement, Client may terminate the Agreement upon thirty (30) days' prior written notice without penalty or cancellation fees.

**10.2    Changes to Service.**  Client acknowledges and agrees that in order to maintain flexibility in the business, Ceridian reserves the right to make changes to the Services or the manner in which they are delivered, at any time and from time to time, as Ceridian considers reasonable and/or necessary (including changes to improve such Services and/or necessary to reflect legislative changes), provided that such change does not materially adversely impact the Services being delivered to Client.

## 11.    NOTICES

**11.1**    All notices to the Parties shall be in writing (including fax or similar writing) and shall be sent to Client at the address set forth on the first page of the Agreement, and to Ceridian to the attention and address of Client's account representative (if any) or to the local Ceridian service center or to such other address or fax number as either Party may hereafter specify by written notice to the other Party. Each such notice, request or communication shall be effective upon receipt, provided that if the day of receipt is not a Business Day, then the notice shall be deemed to have been received on the next succeeding Business Day.

## 12.    FORCE MAJEURE

**12.1**    Neither Party nor their respective Affiliates (nor Ceridian Contractor) shall be held liable or responsible to the other Party nor be deemed to have defaulted under or breached the Agreement for failure or delay in fulfilling or performing any term of the Agreement (except for the failure to pay money) when such failure or delay is caused by or results from causes beyond the reasonable control of the affected Party.

## 13.   BUSINESS CONTINUITY PLAN

**13.1**   Ceridian covenants, represents and warrants that it has developed, and will keep current throughout the term of the Agreement, a formal business continuity plan which details strategies for response to and recovery from potential disasters that could disrupt Ceridian's operations and timely delivery of the Services.

## 14.   GENERAL PROVISIONS

**14.1**   The Agreement and the Parties rights and obligations shall be governed by and construed and enforced in accordance with U.S. Federal law and filed with any federal district court of competent jurisdiction. .

**14.2**   The following provisions shall govern the assignment rights of the Parties:

14.2.1 Either Party may assign its rights and obligations under the Agreement without the consent of the other Party: (i) to an Affiliate of the assigning Party or to a partnership, limited liability company, joint venture or other similar legal entity, of which at least 50% of the equity interests are owned directly or indirectly by the assigning Party or any parent entity, but no such assignment shall release the assigning Party, and such Affiliate or successor entity shall be jointly and severally liable under the Agreement;  or (ii) subject to the terms of Section 14.2.2, to any successor to its business, or a substantial part thereof, whether through merger, amalgamation, consolidation, divestiture or sale. Subject to the terms of Section 14.2.2 and 14.2.3, any other transfer or assignment of the Agreement or any rights hereunder requires the prior written consent of the other Party, which consent may not be unreasonably withheld or delayed. The Agreement shall enure to the benefit of and be binding upon the Parties hereto and their respective successors and permitted assigns. Upon request of the non-assigning Party, any permitted assignee shall execute an agreement in writing with the other Party hereto assuming all obligations of its assignor under the Agreement.  Any purported assignment in contradiction of this Section shall be null and void and be of no force or effect.

14.2.2 Notwithstanding anything in Section 14.2.1 to the contrary, in the event the Party intending to make an assignment (the "Assignor Party") has actual knowledge that the proposed successor entity is a primary competitor of the other Party, the Assignor Party shall provide notice to the other Party of the intended assignment and the identity of the successor entity.  The other Party may then object to the assignment, or withhold its consent to the assignment, provided it makes a reasonable claim that such assignment will materially and adversely affect its business.

14.2.3 In connection with any financing or other capitalization provided to Ceridian and/or any of its Affiliates, Ceridian may, without the consent of Client and without regard to any other limitations set forth in Section 14.2.1, 14.2.2 or elsewhere in the Agreement, assign its rights in the Agreement and any related documents, including without limitation the right to receive payment and require performance from the Client.

**14.3**   In the case of any conflict between the main body of the Agreement which are applicable to all Services, and the terms applicable to only one or more particular Service(s) as set forth in any Service Exhibit, Pricing Schedule or SOW, the terms of the Service Exhibit, Pricing Schedule or SOW shall govern, but only with respect to the particular Services and / or Territory to which the Service Exhibit, Pricing Schedule or SOW relates.  Notwithstanding the foregoing, those Sections titled "Confidentiality and Privacy" through "Limitations of Remedies", inclusive, of the Agreement may not be overridden or amended by the Parties (and all such amendments shall be deemed void) unless approved in writing by each Party's legal counsel.

**14.4**   No action under the Agreement may be brought by either Party more than two years after the cause of action has accrued.

**14.5**   No delay or indulgence by either Party at any time, to enforce any of the provisions of the Agreement, or any right with respect thereto, shall be construed as a waiver of such provision or right, nor shall it prejudice or restrict the rights of that Party.  A waiver of its rights shall not operate as a waiver of any subsequent breach.  No right, power or remedy conferred upon or reserved for either Party is exclusive of any other right, power or remedy available to that Party and the rights, powers and remedies shall be cumulative.

**14.6**   The Agreement may be signed in counterparts, including by way of facsimile or .pdf transmission, with the same effect as if both Parties had signed the same document, and a facsimile or pdf copy shall be considered *prima facie* evidence of the of the information contained in the facsimile or pdf transmission.

**14.7**   Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**14.8**   Headings in the Agreement are for ease of reference only and will not affect its interpretation.

**14.9**  All amounts payable under the Agreement shall be payable in lawful currency as specified in the Service Exhibit and/or Pricing Schedule, or if no such currency is specified, then the currency shall be deemed to be the lawful currency of the Territory in which the Service is being provided.

**14.10**  If more than one entity has signed the Agreement for the same Party, their covenants shall be considered to be joint and several and shall apply to each of them.

**14.11**  The Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and supersedes all prior or contemporaneous agreements and understandings regarding the subject matter hereof, whether written or verbal. Any amendment to the Agreement must be in writing and signed by authorized representatives of both Parties.

Client hereby consents to Ceridian conducting credit investigations, from time to time, including such requests for and exchange of information to and from consumer reporting agencies or credit grantors as it may require to approve and maintain any funding arrangements to be granted by Ceridian in relation to the Services, and to provide payment history information to such agencies. Client acknowledges that the Agreement is conditional upon funding approval of Client.  Client further acknowledges having read and understood all terms of this document, which are set forth on this page and the preceding pages, all of which form an integral part of the Agreement between Ceridian and Client if this Agreement is accepted by Ceridian, such acknowledgement being conclusively evidenced by Client's signature below.

Client acknowledges receipt of this Agreement and acknowledges that it has read, understands, and it is bound by this order and the terms and conditions which are contained in this document

AGREED TO:

**Ceridian Corporation**

By: _R. E. Olson_

Name: _Raymond E. Olson_

Title: _V.P._

Date: _12/28/2012_

ACCEPTED BY:

**Chumash Casino Resort Enterprise**

By: _(signature)_

Name: _C. CLEARWATER_

Title: _CFO_

Date: _12/27/12_



**CERIDIAN CORPORATION ("Ceridian")**

| | |
|---|---|
| **SERVICE EXHIBIT** | FOR INTERNAL USE ONLY |
| **CERIDIAN DAYFORCE HUMAN CAPITAL MANAGEMENT – HR Payroll ("HRP")** | Agreement ID: _____ |
| | Sales Person: _____ |
| | Sales ID: _____ |
| | Payroll No (if applicable): _____ |

**ANTICIPATED SERVICE START DATE:** July 1, 2013

**TERRITORY: United States**

| CLIENT INFORMATION | | | | |
|---|---|---|---|---|
| Client Name **Chumash Casino Resort Enterprise** | | | the "Client" | Current # of Employees 1,750 |
| Service Contact | Phone No. | Fax No. | e-mail | |
| Alternate Contact (Optional) | Phone No. | Fax No. | e-mail | |

## 1.   SERVICE EXECUTIVE SUMMARY

Ceridian shall provide Client with an on-line, Web-based application, consisting of all Subscribed Modules for Client to use to process payroll, perform related human resource activities and receive the associated services described herein (the "Service(s)").  Client's use or non-use of any particular function does not impact its availability or the Fees payable.

## 2.   CAPITALIZED AND DEFINED TERMS

**2.1**   All capitalized terms used herein and not defined shall have the same meaning as in the Agreement.

**2.2**   As used in this Service Exhibit:

**2.2.1**   *"Agreement"* means the written services agreement made between Client and Ceridian to which this Service Exhibit is attached, or, if executed as a separate document, then the written services agreement previously executed by the parties, the details with which the parties are familiar;

**2.2.2**   *"Documentation"* means all documentation relating to the Software, whether in machine-readable or printed form, provided by Ceridian to Client, including any updates, revisions, new versions, and supplements to the Documentation;

**2.2.3**   *"Funds"* means those funds to be received by Ceridian from Client, in an amount equal to the Payments to be made for a particular Payroll;

**2.2.4**   *"Modifications"* means any error corrections, modifications or enhancements to the Software that are included by Ceridian in Support of the Software to all customers;

**2.2.5**   *"New Versions"* means new versions of the Software that may be deployed by Ceridian to Client for license pursuant to this Service Exhibit;

**2.2.6**   *"Number of Employees"* means the number of employee records marked "active" in the employee master file of the Software, including full-time and part-time employees as well as any contingent labor or contractors, or any other individual in respect of whom information is being recorded in a Subscribed Module, and all administrators or other users who are accessing the Software or database relating to the Services (for the purposes of this Service Exhibit, each shall be considered an *"Employee"*);

**2.2.7**   *"One Time Fees"* means those Fees set forth in the Pricing Exhibit under the heading "One Time Fees", including those Fees payable for the Implementation and training Services (as described in Section 3 and 4, respectively), or are otherwise identified or understood to be one time or non recurring Fees, including any Fees payable with respect to change orders;

**2.2.8**   *"Payments"* means the payments to be made by Ceridian on Client's behalf hereunder, in respect of wages to its Employees, statutory remittances, tax filing liabilities and other third party payments as directed by the Client and agreed to by Ceridian;

**2.2.9**   *"Payroll"* means the payroll of Client processed or to be processed by Ceridian with which the Service is associated;

**2.2.10** *"Recurring Fees"* means those Fees shown on the Pricing Exhibit under the heading "Recurring Fees", or are otherwise identified or understood to be Fees which are payable on the periodic recurring basis stated in the Pricing Exhibit;

**2.2.11** *"Service Start Date"* means the <u>actual</u> date on which the Services move beyond the test stage and Ceridian and Client have confirmed (acting reasonably) that the Services are ready for use in a live production environment, which will generally be when the Software is loaded with Client organizational structure, employee information and Client specific rules and Client has administrative control of the Software.  The anticipated Service Start Date is identified above;

**2.2.12** *"Software"* means the software program(s) licensed by Ceridian to Client through which the Service will be provided, together with all Modifications and New Versions;

**2.2.13** *"Subscribed Module"* means, at a given date, the HR, payroll, and benefits enrollment modules to which Ceridian will provide Client access as part of the Service, as such Subscribed Modules have been selected in the attached Pricing Exhibit; and

**2.2.14** *"Support"* means the support and maintenance services provided by Ceridian to Client with respect to a Subscribed Module in accordance with this Service Exhibit.

**2.2.15** *"Taxing Authority"* means those government agencies to which tax remittances are made relating to compensation paid by Client to employees, and any successors to such agencies;

**2.2.16** *"Trust"* means a Ceridian Corporation Payroll Trust established pursuant to a written declaration of trust established by Ceridian Corporation for the purposes of receiving Payroll or tax liability Funds from its clients.

## 3.    IMPLEMENTATION AND DATA CONVERSION

**3.1**    The respective roles, responsibilities and other terms applicable for the implementation of the Service will be set forth in a written SOW, signed by both Ceridian and Client.

**3.2**    Ceridian's Data Conversion Consulting Services extracts and transforms a set of Client's data in preparation for loading into Ceridian systems.  Ceridian offers data conversion for certain discrete sets of data as defined by Ceridian, such as the Payroll Data Set, Check History Data Set, Wage Attachments Data Set, HR Data Set, as elected by Client and reflected on the attached Service Quotation.

**3.2.1** Ceridian Obligations:  Ceridian shall (1) provide a Data Conversion Consultant; (2) create conversion files as defined by the Ceridian Universal Specifications or the equivalent Ceridian specifications; provide Client with instructions for allowing Ceridian's Data Conversion Consultant to properly access Client's third-party-hosted or Client-hosted data storage environment; assist Client in the mapping process; and perform initial audits on the raw data to ensure that required data fields are captured correctly and that the data will meet Ceridian requirements.

**3.2.2** Client Obligations:  Client shall (1) provide a point of contact; (2) provide access, as specified by Ceridian, sufficient to allow Ceridian's Data Conversion Consultant to properly access Client's data storage environment, which may include, but is not limited to, access through database backup, ascii data dump, or direct access to the previous vender's data storage environment; (3) assist with the mapping process, validate, test and audit the conversion files prior to loading into the Ceridian system; and (4) provide the Data Conversion Consultant with the completed file conversion acceptance form upon successful conversion of the data.

## 4.    TRAINING
The scope of training Services outlined below is included in the implementation fees Additional fee based training is available to Client. Client's election of such training, if any, is as set forth in the SOW and Pricing Schedule.

**4.1    Ceridian's Obligations.** Ceridian will:

**4.1.1** Train Client on use of the Services as follows:

Provide access to standard web based training for subscribed modules.  The web based learning consists of specific courses targeted to provide an overview of end user use of the services. Client will have access to the web based specific courses on an unlimited basis during the Term of the Agreement.

**4.2    Client's Obligations.** Client will:

**4.2.1** Complete training requirements within the designated timeframe prior to Service Start Date.

**5.**     **Subscribed Modules.** Below is a description of the Subscribed Modules to be offered by Ceridian to Client, and the respective rights and obligations of Ceridian and Client. Client's election of the Subscribed Modules from the list below is reflected on the Statement of Work.

**5.1**     **Payroll Module.**

**5.1.1** The Payroll Module allows Client to

(i)     input and manage Payroll data in order to run Payroll and tax calculations at the times, locations and schedules agreed between Client and Ceridian from time to time, including without limitation Payroll runs classified as follows: a normal run, a bonus run, an update run, a year end update run and a simulated run;

(ii)     calculate the gross to net pay for each of the Employees;

(iii)     prepare and transmit the legally mandated new hire report; and produce standard and configurable payroll reports;

(iv)     access, save, print and reprint employee W-2's.

**5.1.2 Ceridian's Obligations.** Ceridian shall:

(i)     manage and maintain software to process the Client's Payrolls, and implement modifications to such software and Services as may be required by changes in legislation or other regulatory requirements;

(ii)     if applicable, in Canada, providing those Optional Payroll Services which the Client has elected to receive (as signified by marking the appropriate box on the Pricing Exhibit).

**5.1.3 Client's Obligations.** Client shall:

(i)     enter and maintain Client Payroll data required to meet agreed upon processing schedules.

(ii)     review and audit all Payroll data, reports and other materials prior to committing the Payroll. Client shall correct any discrepancies or errors in such materials prior to the next scheduled processing;

(iii)     monitor changes to those laws specifically applicable to Client's business (excluding those laws and regulations which generally apply to all Ceridian customers receiving similar service), interpreting applicable laws and regulations, determining the requirements for compliance with such laws and regulations, and notifying Ceridian of any changes to the Payroll processing required as a result of such laws;

(iv)     correct Exceptions before transmitting payroll data for Client's next payroll.

**5.2 HR Module.** The HR Module allows Client to manage Payroll, Human Resources and self-administered Benefits information and includes an employee and manager self-service portal that includes the following functionality: Employee Self-Service, Manager Self-Service, Administration, and Configurable Workflow.

**5.2.1 Ceridian Obligations:** Ceridian shall

(i) assist Client with server/user security procedures and addition of administrative user accounts;

**5.2.2 Client's Obligations:** Client shall

(i)     create, delete, and modify individual employee user accounts, including the security level access of each of these accounts;

**5.3 Benefits Module.** The Benefits Module provides Client with benefits administration tools to manage open enrollment and benefits eligibility and generate associated reports.

**5.3.2 Ceridian Obligations:** Ceridian shall

(i)     assist Client with initial configuration of Client's benefit plans based on Client's summary plan definitions and other documentation;

(ii)     assist Client with initial configuration of enrollment processes; and

(iii)     configure exports to benefit plans providers where Client has purchased an export(s) according to the file specifications provided by Client

### 5.3.3 Client's Obligations: Client shall

(i)     provide Ceridian with summary plan definition and other documentation as requested for each benefit plan to be configured ;(ii) validation of and testing of the benefit plan configurations;

(iii)    provide file specifications and technical contacts for benefit plans providers where Client has purchased an export.  Client, as requested by Ceridian, will provide assistance with Client's benefit plans providers to facilitate the export configuration and Client data available for testing with the benefit plans provider;

(iv)    conduct enrollment for Client employee populations;

(v)     provide day-to-day support for Client employees receiving benefits; and

(vi)    maintain the configuration of benefit plans and enrollments processes.

**6. Services.** The scope of ongoing / recurring Services outlined below provides a breakdown of the key functionality and deliverables to be provided, and the respective rights and obligations of Ceridian and Client.

### 6.1 Payment Solutions.

#### 6.1.1 Ceridian Obligations: Ceridian shall

(i)     issue the Payments by way of: (a) submitting Payment information to the appropriate funds transfer network(s) in the form required for the electronic crediting/direct deposit of payment to the designated bank accounts of Client's Employees; and/or (b) create and print (if requested by Client for the Fee set forth on the Pricing Schedule), negotiable paychecks and direct deposit advices to the order of Client's Employees drawn on the Trust account and if printed, provide self sealed mailers and sort in accordance with Client instructions and delivered by by the Client's chosen delivery vendor at the fees negotiated between the Client and its delivery vendor;

(ii)    process file reversals, request stop payment orders and request direct deposit reversals upon Client's written request;

(iii)   at the request of Client or at Ceridian's option, provide Client a report identifying un-cashed paychecks considered stale dated, and pay to Client an amount equivalent to any Payroll Funds held on account of Payments against which stop payments have been placed, or which are, according to banking practice, considered to be stale-dated (less a reasonable administration fee; or at the request of Client, such Payroll Funds may be credited to Client's next Payroll);

(iv)    notify Client of exceptions related to paychecks processing and pre-notification rejections, bank requested notification of change requests, and returned credits related to direct deposit services ("Exceptions");

(v)     notify Client of any errors or other circumstances in the event Ceridian is unable to provide payments and either re-performs Services (when possible) or arrange return of unpaid funds to Client. Unpaid Payroll Funds will be returned only after verification of available and sufficient fund balances (with time allowances for returned items) by the bank in which such funds are held;

#### 6.1.2 Client's Obligations. Client shall:

(i)     be responsible for contacting payees to resolve payment of any voided paychecks and reimburse Ceridian for any losses and fees incurred by Ceridian in circumstances where Ceridian honors Client's request to initiate a stop payment order and issues a replacement check, but the check originally issued is subsequently presented for payment by a holder in due course;

(ii)    require Client's Employees to complete, sign and maintain any account funding authorizations or other documents or authorizations necessary for Ceridian to provide Services, including authorizations for the initiation of credit entries;

(v)     hereby grant to Ceridian the authority to issue Payments on behalf of the Client, and to take such other action as may be necessary from time to time in connection with the provision of the Services, which might authorize to instruct its bank to stop payment and authorize to refuse payment as required to provide the Services;

(vi)    pay for all reasonable expenses incurred by Ceridian as a result of Client errors or omissions.

## 6.2     Tax Filing – Ongoing Services

### 6.2.1 Ceridian's General Obligations. Ceridian will:

(i)    respond to all Taxing Authorities inquiries pertaining to jurisdictions processed by Ceridian;

(ii)    be liable for tax filing penalty and interest charges to the extent such charges were caused by Ceridian;

### 6.2.2  Ceridian's Obligations in the United States

(i)    prepare, deposit, and file Client's Payroll tax returns for those federal, state and local jurisdictions supported by Ceridian's payroll system and listed by Client on Ceridian's Payroll Tax Filing Authorization Form

(ii)    provide Client with a quarterly tax statement for each Federal Employer Identification Number (FEIN) processed by Ceridian. Said statement will include a summary of tax liabilities reported throughout the quarter, an account reconciliation, and reports of the information filed at quarter end; and

### 6.2.3  Client's Obligations.  Client will:

(i)    prior to the first Payroll date, provide Ceridian with such information, forms, Powers of Attorney, written authorizations and other documentation as reasonably required by Ceridian in order to enable Ceridian to determine paid and accrued taxes and tax liabilities, and to remit Client's tax liabilities and otherwise act on Client's behalf in this regard;

(ii)    provide accurate account numbers, remittance frequency and all other information required from time to time to permit accurate and timely remittance by Ceridian;

(iii)    notify Ceridian in writing immediately of any changes to the frequency with which it must make its statutory remittances, and provide Ceridian with any notices it receives from the Taxing Authorities relating to the frequency of such remittances or any other reporting requirements. Client shall continue to receive, review and be the contact for all correspondence and all other communications with the Taxing Authorities, but Client authorizes Ceridian to discuss matters relating to remittance of Client's source deductions with such Taxing Authorities;

(iv)    for each Payroll, forward to Ceridian the necessary information to allow Ceridian to process Client's tax liabilities and otherwise perform the Service, which information shall be provided to Ceridian such number of days prior to the processing date as may be directed by Ceridian. Such input data will be forwarded to Ceridian in the format reasonably specified by Ceridian from time to time (having regard to Client's facilities);

(v)    upon receipt of any and all records of tax disbursements, examine the disbursements for validity and accuracy according to Client's records and notify Ceridian of any inaccuracies within ten (10) Business Days of receipt;

(vi)    communicate in writing any changes in services or changes that affect the information provided by Client to Ceridian's tax filing department within ten (10) Business Days from such change. Any penalty or other charges that result from incorrect, incomplete, or changed tax information provided by Client are Client's sole and exclusive liability and responsibility. Ceridian is not responsible for any matters existing prior to Ceridian's first Payroll date;

(vii)    assist Ceridian in responding to Taxing Authorities inquiries or in processing amendment requests by providing the information and funds, if applicable, necessary to meet Taxing Authorities requirements; and

(viii)    retain records according to the schedules established by Taxing Authorities for Client. Ceridian has no responsibility or liability for maintaining or retaining records on behalf of Client.

## 6.3    Tax Filing – Year End Services

### 6.3.1  Ceridian's Obligations in the United States.  Ceridian will:

(i)    prepare and file employer W-2s and annual reconciliation forms in the formats required by each Taxing Authority provided that Ceridian has provided tax filing Services for each Client FEIN for the entire calendar year. Print W-2's in accordance with the Fee set forth on the Pricing Schedule, provide in self sealed mailers and sort in accordance with Client instructions. If Ceridian did not provide tax filing Services for each Client FEIN for an entire calendar year, Ceridian will prepare employer W-2s and annual reconciliation forms in the formats required by each Taxing Authority provided that Client provides Ceridian with the required mid-year and/or mid-quarter data in the time frame and format required by Ceridian.

### 6.3.2  Client's Obligations.  Client will:

(i)    review and approve any adjustments identified in the preliminary year end report by Ceridian prior to Ceridian processing the adjustments;

(ii)    review and approve final year end report and balancing provided by Ceridian, and authorize commencement of year end processing;

(iii)   distribute applicable tax forms to the Employees in accordance with applicable deadlines established by the Taxing Authorities; and

(iv)    submit any necessary changes to the year end tax file in accordance with the time frames reasonably established by Ceridian (such time frames will be established based on the time required, after receipt of such information by Ceridian, for Ceridian to perform its responsibilities within the time prescribed by the Taxing Authorities).

**6.4     Year End Employee Tax Forms**

**6.4.1  Ceridian's General Obligations.** Ceridian will:

(i)     prepare and submit to Client for its review and approval an electronic tape filing and/or report showing the required Client tax summaries relating to the Employees in respect of which Ceridian has produced Tax Forms;

(ii)    deliver the Tax Forms to Client no later than two (2) Business Days prior to the date requested by the applicable payroll laws, in the year immediately following the calendar year for which the Tax Forms are being prepared (subject to Client's obligations to provide data and review output as contemplated herein, in a timely fashion);

(iii)   provide support services via telephone, electronic mail and/or access to Ceridian's designated website for Client's technical personnel and primary users of the Service;

(iv)    annually publish the Tax Forms production schedule;

(v)     print and/or post the type(s) and quantity of Tax Forms specified by Client and as the data appears in the file transmitted by Client;

**6.4.2  Ceridian's Obligations in the United States**

(i)     retain posted electronic image data for thirty-six (36) months;

(ii)    package Tax Forms for shipment within ten (10) Business Days after receipt of final correct and approved file transmission. Ceridian is not responsible for providing additional services, including implementation or support of software customizations or re-formatting of data, except where Ceridian has agreed in writing to provide such services. The Services do not include filing of Tax Forms or the creation of magnetic media for agency filings. Additional charges will apply for any Client requested (a) sorting and/or splitting, (b) printing of 1099s, or (c) special employee reports.

**6.4.3  Client's Obligations.** Client will:

(i)     review electronic tape filings and reconcile such reports provided by Ceridian with the data generated from Client's payroll system in a timely manner so as to allow Ceridian the time to make any necessary changes. Standard year end accounting requirements will be the responsibility of Client;

(ii)    transmit accurate data and information per the annually published Tax Forms production schedule;

(iii)   review test data and printed Tax Forms on a timely basis upon receipt of same and notify Ceridian of any errors in such materials within two (2) Business Days of receipt of printed Tax Forms. Client agrees to reimburse Ceridian for all expenses incurred by Ceridian as a result of Client errors or omissions;

(iv)    adhere to the annually published Tax Forms production schedule provided by Ceridian including: (a) completion of all setup and testing in the timeframe designated by Ceridian; (b) provision of final file in the timeframe designated by Ceridian; (c) provision of test data file in agreed upon format, and according to the annually published Tax Forms production schedule; (d) provision of production data containing the final data to be printed in the same file format provided during testing, and according to the annually published Tax Forms production schedule deadline;

(v)     in the United States, update the website with new employee logins and passwords for electronic access to the Print Services Website;

(vi)    designate centralized points of contact within its organization to act as the primary contact for Service questions and resolutions, and, in the United States, employee password reassignments and maintenance of the Print Services Website.

**6.5     Wage Garnishment Disbursement Services**

**6.5.1  Ceridian's Obligations.** Ceridian will:

(i)    timely prepare and deposit Client's wage garnishment liabilities for those federal, state, and local payment processing units and individual third parties supported by Ceridian, including any individual third party with a valid address in the United States or Canada to which an Employee owes a debt and has agreed or is compelled by appropriate governmental authority to resolve via garnishment of Employee's wages. Such disbursements will be made in US dollars;

(ii)    collect funds to cover the total amount of wage garnishment liabilities transmitted by Client in accordance with the terms set forth in the funding authorization; and

(iii)    provide a monthly statement of account activity to Client summarizing funds collection and disbursement transactions completed during the prior calendar month.

**6.5.2  Client's Obligations.** Client will:

(i)    provide wage garnishment data including without limitation, wage order data, wage garnishment amounts, payee addresses, bank account information in a Ceridian approved format as outlined in user manuals, customer communications and service advisories before 3:00 p.m. Eastern Time two (2) Business Days prior to the check date;

(ii)    provide funds to cover the total amount of wage garnishment liabilities transmitted by Client in accordance with the terms set forth in the Funding Authorization;

(iii)    notify Ceridian of any unscheduled and/or special Payroll runs that will impact wage garnishment data including without limitation, void, manual, and/or adjustment transactions; and

(iv)    correct any errors before transmitting Client's next Payroll or wage garnishment data transmission. Any penalty or other charges that result from incorrect, incomplete, and/or changed wage garnishment data received by Ceridian from Client, or from Client's changed information or signatures and documents in Client's possession that that are not provided to Ceridian in a timely manner are Client's sole and exclusive responsibility.

**7.    Data Accuracy:** Client is solely responsible for the accuracy of all data, records and for all information furnished to Ceridian. Ceridian is not responsible for any matters existing prior to the first Ceridian Check Date. Ceridian is not obligated to commence providing Services until receipt of sufficient information to determine Client's paid and accrued taxes and liabilities. If Ceridian corrects any matters existing prior to the first Check Date or performs any other service not expressly identified in this Agreement, Client will pay Ceridian additional fees and charges computed on the basis of work performed by Ceridian.

**8.    Fund Transfers:**

**8.1    Ceridian Obligations.** Ceridian shall:

(i) establish and maintain the Trust for the purpose of holding and keeping Funds and other trust funds received from its clients separate from Ceridian's own property. For clarity, the principal amount of the Funds received by Ceridian from Client shall at all times while in the possession or control of Ceridian, be held in its capacity as trustee of the Trust.

**8.2    Client's Obligations.** Client shall:

(i) forward the Funds to an account established by the Trust as directed by Ceridian. The Funds will be provided by Client in a manner satisfactory to Ceridian, acting reasonably, and where Ceridian is debiting Client's account, Client will fully fund Client such account and authorize the initiation of debit entries and the debiting of the account in the amount and on the date specified, and ensure that such authorization is operative at the time of transmittal and debiting of Client account. Ceridian shall not be obliged to release any Payroll documents or to make or honour any Payments until it has received confirmation that Client's financial institution upon which the Funds have been drawn has irrevocably honoured such request for advance of funds. In this regard, Ceridian reserves the right, at its option, to implement such procedures as may reasonably be required to guarantee the irrevocable receipt by it of the Funds prior to Ceridian paying out any such funds;

(ii) provide Ceridian with Funds in an amount equal to the tax liability Payments to be made for a particular Payroll, together with the full amount of the Fees due hereunder in respect of such Payroll (and applicable Taxes on such Fees).

**8.3    Client's Acknowledgement Regarding Trust Funds.** Client acknowledges that Ceridian, as trustee of the Trust, is entitled to invest monies held by the Trust in accordance with the investment guidelines established from time to time by Ceridian's Board of Directors, and that Ceridian, in its own capacity and not as trustee, is entitled as income beneficiary to all income and gains derived or realized from such investments and is not accountable to Client, the Employees, or any other person for such income or gains. The Trust is entitled to pledge such investments for borrowings of the Trust to facilitate the Payments, rather than converting the investments into cash. Ceridian shall indemnify

and save Client harmless from and against any loss of any portion of the principal amount of the Funds (including any losses of principal resulting from the investment of the Funds) caused by Ceridian, in its own capacity or as trustee of the Trust to the extent such Funds were actually received by Ceridian.

## 9. Service Rights and Obligations of the Parties.

### 9.1 Ceridian's Obligations.

**9.1.1** Subject to the terms and conditions of the Agreement (including in particular this Service Exhibit), Ceridian hereby grants to Client a temporary, personal, non-exclusive, and non-transferable license to access the Software designated above and hosted by or for Ceridian. This license is for the internal use of the Software for the Number of Employees and for the period of time designated herein. Client agrees that any change in the Number of Employees shall result in a corresponding change in the Fees payable by Client.

**9.1.2** Ceridian shall host and provide ongoing support for the Software and supported third party products from data centers accessible via the internet. Except for planned maintenance, the web-based application interface for the production environment that will be accessed through Client URL, shall be available, on average, 99.5% of the time each calendar month.

**9.1.3** For so long as this Service remains in effect, and provided that Client has paid the applicable Fees, Ceridian shall provide Support in accordance with the following:

(i)    Ceridian will use commercially reasonable efforts, commensurate with the severity of the error, to correct any malfunction, defect or non-conformity in the operation of the Software from the Documentation (each, a "Defect") to enable the Software to substantially perform in accordance with the Documentation in effect at the time the Support is provided. Client shall report to Ceridian any Defects and Ceridian shall only be obligated to provide Support if Client submits to Ceridian all information, documentation, technical and other assistance to assist Ceridian;

(ii)    Ceridian shall not be obligated to provide Support if the Software is not used in accordance with the then current Documentation or if any Defect reported by Client is found by Ceridian to be due to the misuse, improper use, alteration, or damage of the Service, lack of training, or any other cause other than the Software as delivered by Ceridian. Client shall pay Ceridian, at Ceridian's then current hourly rates, for Ceridian's services in responding to a Client report of a Defect, if: (1) such Defect does not exist; (2) Client does not assist Ceridian as required; (3) the Software is not used in accordance with the Documentation; or (4) the Defect is not caused by the Software. If Ceridian may reasonably correct any such Defect, Ceridian may correct it and Client shall reimburse Ceridian for such correction at Ceridian's then current hourly rates;

(iii)    Support may be provided to Client named support users through one or more of a number of means at Ceridian's reasonable discretion, such as telephone, e-mail, online meeting, or Internet self-service, which includes general technical information and assistance with problem determination, isolation, verification, and resolution during Ceridian's standard hours each Business Day. Ceridian will provide after hours telephone access for Client reporting of service interruptions. Support services are not to be used as an alternative to obtaining training. Client shall make commercially reasonable efforts to refer to the Documentation as a first step in answering questions and learning functions of the Service prior to contact with Ceridian with regard to problems or questions;

(iv)    A maximum of five (5) named persons (as indicated on the "Help Line" access list provided from time-to-time by Client to Ceridian) trained on the use and operation of the Software may have access to the Ceridian help line for problem resolution. Ceridian will use commercially reasonable efforts to perform all required maintenance to the Software (or any other elements of the hardware or infrastructure necessary for the provision of the Services contemplated under this Service Exhibit) during the planned maintenance window, which is currently Wednesdays and Saturdays between 1:15 a.m. and 5:15 a.m. Eastern Standard Time. Ceridian will use commercially reasonable efforts to keep the period during which Client's access to the system is impeded during the maintenance period to a minimum. Ceridian will use commercially reasonable efforts to notify Client of all maintenance at least twenty-four (24) hours in advance. Ceridian will not be responsible for any damages or costs incurred by Client, if any, for scheduled down time. Ceridian may change its maintenance window upon prior notice to Client;

(v)    Support provided under this Service Exhibit does not include services provided with respect to the following matters: (i) any problem resulting from configuration or customization of the Service (including any Professional Services) made by or at Client's direction and/or approval; or (ii) any problem caused by modifications of the Software not made or authorized by Ceridian (other than ordinary configuration changes the functionality for which is built into the Software and intended to be made by Client).

**9.1.4** Ceridian may from time to time (but shall not be required to) make changes to the Software and / or its functionality, for purposes such as maintenance or upgrades, or otherwise as deemed appropriate by Ceridian. Such changes are within the discretion of Ceridian, and are not required to be made, and in particular (but without limitation) notwithstanding any intentions which may have been conveyed by Ceridian with respect to its possible plans for future functionality or features;

## 9.2 Client's Obligations.

**9.2.1** Client shall continue to have all responsibilities set forth in the Agreement and, in addition, shall further ensure that: (i) all data and other materials provided to Ceridian for purposes of providing the Service shall be accurate and ready for processing; and (ii) it makes available such resources as are reasonably necessary to support Ceridian's provision of the Service. Client is responsible for all activities that occur in Employee accounts and for Employees' compliance with this Agreement. Client shall: (i) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all Client data; and (ii) use commercially reasonable efforts to prevent unauthorized access to, or use of, the Service, and notify Ceridian promptly of any such unauthorized access or use.

**9.2.2** Client may not distribute or disclose the Software, or any portion thereof, by transfer, lease, loan or any other means, or make it available for use by others in any manner. The resale of services based on this license, or the utilization of the licensed Software in a commercial service bureau environment, are strictly prohibited.

**9.2.3** Client will not: (i) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (ii) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material that is harmful to children or violates third party privacy rights; (iii) send or store any virus, worm, time bomb, Trojan horse or other harmful or malicious code, file, script, agent or program; (vi) interfere with or disrupt the integrity or performance of the Service or the data contained therein; or (vii) attempt to gain unauthorized access to the Service or its related systems or networks.

**9.2.4** Client will designate named support users to triage all internal support incidents reported by end users. Triage occurring by Client support users includes: checking the Documentation for assistance in dealing with the reported incident, attempting to reproduce the incident in a production copy, and documenting the steps required to reproduce the incident. Upon reporting an incident, Client agrees to cooperate, work closely with, and provide assistance to Ceridian in the investigation, diagnosis, and resolution of the incident.

**9.2.5** Ceridian shall have the right to access Client's account from time to time, for purposes of Support, administration, invoicing and to inspect Client's utilization of the Services so as to ensure Client's compliance with the provisions of this Agreement, as reasonably necessary in Ceridian's sole discretion.

## 10 OTHER SERVICE SPECIFIC TERMS

**10.1    Service Warranty.** Ceridian warrants that for the Term, the Software shall perform in accordance with the Documentation. Client's exclusive remedies for breach of this warranty are: (i) Client may request Support from Ceridian; and (ii) if the Support requested by Client does not enable the Software to comply with the warranty within a reasonable period of time, Client may seek direct damages for the affected Software, subject to the limitations of liability in the Agreement. Ceridian shall not be liable to remedy any claimed breach of this warranty due to the acts or omissions of Client or any third party. EXCEPT FOR THE LIMITED WARRANTY SET FORTH IN THIS SECTION, THE SOFTWARE IS PROVIDED "AS-IS" AND "AS-AVAILABLE." THE EXPRESS LIMITED WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS EXPRESSED OR IMPLIED, CONTRACTUAL OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**10.2    Verifying Compliance.** Ceridian has the right to verify Client's compliance with the terms of this Service Exhibit (at Ceridian's own expense), at any time throughout the Term and for a period of one year thereafter, and Client shall maintain records relating to the Services hereunder for not less than such period. Ceridian will have the right, on its own behalf or through the use of a third party independent review firm, on not less than 30 days prior notice, to conduct an inspection of the relevant Client records during Client's normal business hours and in a manner that does not interfere unreasonably with Client's operations. In addition, Ceridian may require Client to complete a self-audit questionnaire relating to the Services, but in such case Ceridian reserves the right to use the normal in person verification process as set out above. If Ceridian undertakes verification and does not find Material (as defined below) unauthorized use of the Services, Ceridian will not undertake another verification of Client for at least one year. Ceridian and its third party firms will use the information obtained in compliance verification only to enforce Ceridian's rights under the Agreement and to determine whether Client is in compliance with the terms of the Agreement. By invoking the rights and procedures described above, Ceridian does not waive its rights to enforce the Agreement or to protect its Intellectual Property by any other means

permitted by law. As used herein in the context of payment of any Fees or other sums due, the term "Material" means a shortage of 5% or more. If a verification or self-audit reveals any underpayment of Fees (regardless of whether Material or not), Client will promptly pay to Ceridian the amount of such shortage, together with interest from the date such amounts should have been paid, at a rate equal to the prime lending rate then in effect with Ceridian's main financial institution, plus 5%. Additionally, if the shortage in Fees is found to be Material, in addition to the above amount, Client shall also reimburse Ceridian for all costs Ceridian has incurred in connection with the verification process.

## 11 FEES AND PAYMENT

**11.1**    **Fees.** The Fees payable by Client to Ceridian for the Services are as set forth in the attached Pricing Exhibit. The Fees are exclusive of all Taxes. In addition to the Fees, Client shall reimburse Ceridian for all expenses (if any, in accordance with Ceridian's expense policy) incurred in connection with the implementation and provision of the Services, including travel, accommodation and meals. Except as otherwise stated herein, all invoices will be due and payable within ten (10) days of the date of invoice.

**11.2**    **One Time Fees.**

**11.2.1** The One Time Fees have been calculated taking into account the work and materials Ceridian has reasonably estimated will be required to implement the Service. This estimate has been made by Ceridian in good faith based on the information available to Ceridian at the time of executing this Service Exhibit, including information and representations provided by Client. Ceridian reserves the right (acting reasonably) to increase the One Time Fees to the extent that new or additional information becomes available to Ceridian which impacts the estimated One Time Fees, provided that in no event will such increase exceed thirty percent (30%) of the aggregate One Time Fees set forth in the Pricing Exhibit. In such case, Ceridian will provide Client with written notice of the increase, specifying the reason for such increase, as soon as reasonably practical during the discovery phase.

**11.2.2** Subject to any payment terms to the contrary in the SOW, the One Time Fees will be invoiced and payable in 2 installments as follows: (a) fifty percent (50%) at the date implementation Services are started (generally by way of a kick off meeting) and (b) fifty percent (50%) at Service Start Date. However, Ceridian reserves the right to invoice and require payment of One Time Fees on a monthly basis (including for longer / more complex implementations), based on the amount of work completed each month.

**11.3**    **Recurring Fees.**

**11.3.1** Subscribed Modules: The monthly Recurring Fees will be invoiced and payable monthly in advance, commencing as of the Service Start Date (subject to Section 11.3.3 below), based on the Number of Employees as at the 15th of each calendar month, or other such date as may be communicated to Client by Ceridian. All invoices are payable within ten (10) days of the date of invoice. Any estimated annual Fees shown in the Pricing Exhibit are estimates only, based on Client's Number of Employees as at the date of signing this Service Exhibit.

**11.3.2** Services: The monthly Recurring Fees will be invoiced and payable monthly in advance, commencing as of the Service Start Date (subject to Section 11.3.3 below), based on the Number of Employees as at the 15th of each calendar month, unless otherwise stated on the Pricing Exhibit. Services included on the Pricing Exhibit that are based on a per transaction count, will be invoiced monthly in arrears. All invoices are payable within ten (10) days of the date of invoice. Any estimated annual Fees shown in the Pricing Exhibit are estimates only, based on Client's Number of Employees and/or transaction count as at the date of signing this Service Exhibit.

**11.3.3** Once Ceridian commences those implementation Services described in Section 3 above, a Client instance of the Software is established for the purposes of configuration, user testing and implementation team training. In order to compensate Ceridian for the work required to establish and maintain such Client environment prior to the Service Start Date, Client shall pay Ceridian, commencing as of the date Ceridian commences implementation Services, through to the Service Start Date (the "*Pre-Production Period*"), a pre-production monthly Recurring Fee equal to 50% of the regular monthly Recurring Fees. This monthly Pre-Production Period Fee will be based on the actual number of Client employees as at the date the Service Exhibit is signed, regardless of the actual Number of Employees loaded into the Software during the Pre-Production Period.

**11.3.4** When and if available, at Client's election, SMS text messaging for "Alerts and Notifications" functionality will be provided to Client at Ceridian's then current rate per message (both outbound and inbound messages shall be counted for the purposes of billing). Other miscellaneous charges may apply for mobile device access. Such fees shall be billed based on the actual count for the previous month.

## 12 ADDITIONAL PROVISIONS

**12.1   Publicity and References.**  For marketing purposes, Ceridian shall be at liberty to advise its clients and potential clients (directly or through marketing materials) of the fact that Ceridian provides the Services to Client (but, for certainty, without disclosing any business or other confidential terms of this Agreement).  In this regard, Client agrees that Ceridian may include Client's name or logo in a list of its clients, provided that any use of Client's trade-mark(s) must retain any proprietary notices and/or are properly attributed to Client.  Client shall, if so requested by Ceridian, make available to Ceridian (and such clients or potential clients), a representative of Client to act as a reference for Ceridian, and to answer questions and generally provide information to such clients or potential clients of Ceridian regarding the Services and Ceridian's provision thereof.  Client further agrees to reasonably co-operate with Ceridian with respect to providing any further reference information or resources as may reasonably be requested by Ceridian from time to time.

**12.2**   Without limiting the generality of Section 12.1, Client agrees to: (a) provide quotations and approve press releases announcing Client as a new client of Ceridian or announcing Client's successful go-live with the Online Service; (b) allow Ceridian to include a brief description of the Services furnished to Client in Ceridian promotional materials; (c) assist Ceridian in developing a case study, ROI analysis, white paper and/or related marketing materials ("*Marketing Materials*"); (d) provide interviews to the news media; (e) organize mutually convenient site visits for Ceridian potential clients; and (f) make presentations at conferences.  The consent of both Parties shall be obtained prior to the release of any press releases or Marketing Materials, which consent shall not be unreasonably withheld, conditioned, or delayed.

---

In consideration of the Fees to be paid hereunder, Client hereby requests that Ceridian provide those Services in accordance with the terms and conditions set forth in this Service Exhibit.  This Service Exhibit may be executed either contemporaneously or subsequent to the Agreement, and in either case the terms of this Service Exhibit shall be deemed to be incorporated into and form an integral part of the Agreement.  In the latter case where subsequently executed, the Agreement shall be considered amended by adding the provisions of this Service Exhibit, and to the extent this Service Exhibit does not modify the Agreement, the Agreement shall continue in full force and effect, unamended, and otherwise the execution of this Service Exhibit will not serve to revise the relationship between the Parties and any unremedied and outstanding accounts, breaches or other matters existing between the Parties as at the date this Service Exhibit is executed will remain intact and subsisting notwithstanding the amendment of the Agreement.

---

Dated as of the _27th_ day of _December_____, 2012.

**Ceridian Corporation**

Per: _R. E. Olson_____
         (Signature)

Print Name: _Raymond E. Olson_

Title: _____V.P._____
I have the authority to bind the corporation.

**Chumash Casino Resort Enterprise**

Per: _C. Clearwater_____
         (Signature)

Print Name: _C.CLEARWATER_____

Title: _CEO_____
I have the authority to bind the corporation/partnership.



**CERIDIAN CORPORATION**
**("Ceridian")**

**SERVICE EXHIBIT**

**CERIDIAN DAYFORCE HUMAN CAPITAL**
**MANAGEMENT – Workforce Management ("WFM")**

FOR INTERNAL USE ONLY

Agreement ID: _____
Sales Person: _____
Sales ID: _____
Payroll No (if applicable): _____

**ANTICIPATED SERVICE START DATE:  July 1, 2013**

**TERRITORY: United States**

| CLIENT INFORMATION | | | | |
|---|---|---|---|---|
| Client Name **Chumash Casino Resort Enterprise** | | | the "Client" | Current # of Employees 1,760 |
| Service Contact | Phone No. | Fax No. | e-mail | |
| Alternate Contact (Optional) | Phone No. | Fax No. | e-mail | |

## 1.    SERVICE EXECUTIVE SUMMARY

Ceridian shall provide Client with an on-line, Web-based application, including all Subscribed Modules, for Client to use to process and store information regarding Employees (the "Service(s)").   Client's use or non-use of any particular function does not impact its availability or the Fees payable.

## 2.    CAPITALIZED AND DEFINED TERMS

**2.1**    All capitalized terms used herein and not defined shall have the same meaning as in the Agreement.

**2.2**    As used in this Service Exhibit:

**2.2.1**  *"Agreement"* means the written services agreement made between Client and Ceridian to which this Service Exhibit is attached, or, if executed as a separate document, then the written services agreement previously executed by the parties, the details with which the parties are familiar;

**2.2.2**  *"Ceridian Clocks"* means clocks, hardware and other ancillary products, sold by Ceridian to Client as part of the Services, as set forth in the attached Pricing Schedule;

**2.2.3**  *"Documentation"* means all documentation relating to the Software, whether in machine-readable or printed form, provided by Ceridian to Client, including any updates, revisions, new versions, and supplements to the Documentation;

**2.2.4**  *"Modifications"* means any error corrections, modifications or enhancements to the Software that are included by Ceridian in Support of the Software to all customers;

**2.2.5**  *"New Versions"* means new versions of the Software that may be deployed by Ceridian to Client for license pursuant to this Service Exhibit;

**2.2.6**  *"Number of Employees"* means the number of employee records marked "active" in the employee master file of the Software, including full-time and part-time employees as well as any contingent labor or contractors, or any other individual in respect of whom information is being recorded in a Subscribed Module, and all administrators or other users who are accessing the Software or database relating to the Services (for the purposes of this Service Exhibit, each shall be considered an *"Employee"*);

**2.2.7**  *"One Time Fees"* means those Fees set forth in the Pricing Schedule under the heading "One Time Fees", including those Fees payable for the Implementation and training Services (as described in Section 3 and 4, respectively), or are otherwise identified or understood to be one time or non recurring Fees, including any Fees payable with respect to change orders;

**2.2.8**  *"Payroll"* means the payroll of Client processed or to be processed by Ceridian with which the Service is associated (if Client is using Ceridian payroll services);

**2.2.9**  *"Recurring Fees"* means those Fees shown on the Pricing Schedule under the heading "Recurring Fees", or are otherwise identified or understood to be Fees which are payable on the periodic recurring basis stated in the Pricing Schedule;

**2.2.10** *"Service Start Date"* means the <u>actual</u> date on which the Services move beyond the test stage and Ceridian and Client have confirmed (acting reasonably) that the Services are ready for use in a live production environment, which will generally be when the Software is loaded with Client organizational structure,

employee Information and Client specific rules and Client has administrative control of the Software. The anticipated Service Start Date is identified above;

**2.2.11** "*Software*" means the software program(s) licensed by Ceridian to Client through which the Service will be provided, together with all Modifications and New Versions;

**2.2.12** "*Subscribed Module*" means, at a given date, a module of the Software to which Ceridian will provide Client access as part of the Service, as such Subscribed Modules have been selected in the attached Pricing Schedule or as may be added by Client by way of amending agreement entered into by the Parties from time to time; and

**2.2.13** "*Support*" means the support and maintenance services provided by Ceridian to Client in accordance with this Service Exhibit.

**3.    IMPLEMENTATION** The respective roles, responsibilities and other terms applicable for the implementation of the Service will be set forth in a written Statement of Work, signed by both Ceridian and Client.

**4.    TRAINING** The scope of training Services outlined below is included in the implementation fees Additional fee based training is available to Client. Client's election of such training, if any, is as set forth in the SOW and Pricing Schedule.

**4.1    Ceridian's Obligations.** Ceridian will:

4.1.1   Train Client on use of the Services as follows:

Provide access to standard web based training for subscribed modules. The web based learning consists of specific courses targeted to provide an overview of end user use of the services. Client will have access to the web based specific courses on an unlimited basis during the Term of the Agreement.

**4.2    Client's Obligations.** Client will:

4.2.1   Complete training requirements within the designated timeframe prior to Service Start Date.

**5.    ONGOING SERVICES** The scope of ongoing / recurring Services outlined below provides a breakdown of the key functionality and deliverables to be provided, and the respective rights and obligations of Ceridian and Client.

**5.1    Functionality and Deliverables.** Below is a description of the Subscribed Modules to be offered by Ceridian to Client. Client's election of Subscribed Modules from the list below is reflected on the Statement of Work.

5.1.1   **WFM Core / Time and Labor Management** Includes Time, Labor Tracking (Departments, Jobs, Dockets, Projects), Scheduling (Shift Rotations, Shift Definitions, On-demand Shifts), Time Away from Work Management, Alerts and Notifications, Webclock and Ceridian Payroll Product integration (including payroll based accruals).

(i)     Time and Labor allows users to track and edit employee time and labor costing, and configure certain gross pay rules;

(ii)    Scheduling allows users to create and edit weekly employee schedules. Please note that the scheduling functionality contained in WFM Core does not include scheduling compliance functionality (such as basis minimum and maximum rules) which is included in the "Labor Forecasting and Assisted Scheduling" and "Labor Forecasting and Optimized Scheduling" modules;

(iii)   Alerts and Notifications include in-system and email messaging options based on certain triggering events for workflows and immediate problem notifications;

(iv)    Webclock enables a client PC to be used as a time clock device for employee punches that are fully integrated in the WFM Core functionality (Offline webclock may be made available to Client at an additional cost);

(v)     Time Away from Work Management ("TAFW") for Supervisor and Payroll Administration roles allows users to view, approve, and track employees' requests for time away from work; and

5.1.2   **Employee System Access** allows employee level users to view their schedule, view and edit their time card, view and edit availability, and request time away from work. Supervisor level users and above obtain system access as part of WFM Core. In addition, includes:

(i)     mobile device access to functionality for employees and supervisors, including;

(a)     For employees - enter punches, view accrual balances and submit TAFW requests, view scheduled shifts, and view and change availability;

(b)     For supervisors - view daily attendance and perform call-ins; view a list of employees for a location, their contact information, and their recent and upcoming shifts; review,

approve, and deny TAFW requests; view tasks and adjust their completion status; set location geo-coordinates and range limits for punches;

Client acknowledges and agrees that it is Client's responsibility to inform its employees of the tracking of geographical information and to obtain all necessary consents with respect thereto. Client shall be responsible for complying with all applicable laws associated with the tracking of information (including, without limitation, all applicable privacy laws). Ceridian shall not be responsible for Client's use of such information or the application, and Client shall indemnify and save Ceridian harmless from and against any and all reasonable and direct loss, damage or liability which Ceridian may incur arising from Client's use of the application (including, without limitation, invasion of privacy claims); and

(c)     a messaging system for sending and receiving messages within the system, by user name, distribution list, and employee filters such as location, department and other filter parameters.  Messages can include alerts, task reminders, company-wide messages and external news feeds.

**5.1.3  Entitlements Functionality** enables the automation of calculation and tracking of employee entitlements (accruals) balances.

**5.1.4  Attendance Tracking** enables tracking of attendance, assignment of points based on absence or tardy classifications.

**5.1.5  Shift Trading** enables employee and supervisor users to post and trade work shifts with workflow automation and approvals.

**5.1.6  Schedule Bidding** allows employee users to request preferred shift rotations.  Management users can approve employee request, or requests can be automatically approved based on rules.

**5.1.7  Overtime Equalization** facilitates the automation of Client's overtime policies.  This module helps managers equalize the amount of overtime each employee has been offered during the current month, last month, and year-to-date.  It also displays the amount of offered overtime each employee has accepted and rejected.  The system automatically schedules any employees recorded as having accepted the overtime offer with the created scheduled shift matching the time specified in the overtime offer.

**5.1.8  Labor Forecasting & Assisted Scheduling** enables forecasting of estimated metrics, such as weekly sales, and estimation of labor requirements based on these metrics and user edits.  Ability for a user to create a schedule.  Assignment of a score based in part on comparing this schedule with the estimated requirements.  Notifies the user of certain conflicts between the schedule and certain rules in the software or in a configuration (for example, rules regarding daily or weekly minimum or maximum hours per employee, consecutive days worked by an employee, minimum lengths of time between shifts, rules that apply only to minors, or rules regarding employee availability conflicts).

**5.1.9  Labor Forecasting & Optimized Scheduling** enables Forecasting of estimated metrics, such as weekly sales, and estimation labor requirements based in part on these metrics and user edits.  Preliminary allocation of budgeted labor hours based in part on this estimate, automatic generation of a preliminary schedule (including automatic assignment of employees to shifts), and ability for a user to edit the resulting schedule.  Assignment of a score based in part on comparing this schedule with the estimated requirements.  Notifies the user of certain conflicts between the schedule and certain rules in the software or in a configuration (for example, rules regarding daily or weekly minimum or maximum hours per employee, consecutive days worked by an employee, minimum lengths of time between shifts, rules that apply only to minors, or rules regarding employee availability conflicts).

**5.1.10  Labor Budgeting** facilitates the creation of labor budgets (hours and dollars) based on historical trends.  User Edits can be made based upon key performance indicator targets.

**5.1.11  Task Management** allows supervisor / manager users to create new tasks and recurring tasks, assign tasks to employees, attach documents, and estimate labor impact.  Employee users and manager users can confirm tasks are completed and comment on the task.

**5.1.12  Human Resources** allows users to input, edit or view information regarding certain employees, such as qualified jobs, skills, completed courses, contact information, emergency contracts, and whether that employee has signed off on company policies.

**5.1.13  Projects** allows Client to establish a hierarchical interface for managing projects.  The user can define project groups, subgroups and individual projects - each of which can be assigned throughout the organizational hierarchy.  For each project, the user is able to define assigned jobs. Employees working at any of the jobs assigned to a project are able to log their time against that project via time capture devices, timesheet entry or the manager's timesheet.  Owners of a project are able to monitor hours and labor costs relative to the budget for their project.

**5.1.14 Analytics** provides Client with visibility into corporate performance at every level and incorporates key performance indicators to help evaluate best and worst performers. Visibility is provided by:

(i)     displaying organizational performance at a high level with drill down to the finest level of detail; and

(ii)    a visual representation of results on a rolling time basis.

**5.1.15 Ad Hoc Report Writer** allows users to create new reports and make them available to other users. Based on their role, users can base reports on the data contained in the various data topics which include details on employee records or pay records. A maximum of five (5) users will be provided with report writing capability.

**5.1.16 Advanced Template Scheduling** is expected to provide a position/job/shift-based model for building schedules. It is expected to include the ability to create and save schedule templates, load a template for a week and assign employees to those shifts either manually or by using the AutoFill engine that assigns shifts based upon configured priority rules. At the time of contracting, this module is in its first release and not fully functional. It is Ceridian's intention to complete the development of this module and the recurring cost of it is included in the PEPM fee in the Pricing Schedule. The implementation effort for this module cannot be accurately scoped at this time, but Ceridian has allotted 170 hours in the Pricing Schedule as a budget for Client to leverage at such time that the module can be implemented.

**5.2     Service Rights and Obligations of the Parties.**

**5.2.1   Ceridian's Obligations.**

(i)     Subject to the terms and conditions of the Agreement (including in particular this Service Exhibit), Ceridian hereby grants to Client a temporary, personal, non-exclusive, and non-transferable license to access the Software designated above and hosted by or for Ceridian. This license is for the internal use of the Software for the Number of Employees and for the period of time designated herein. Client agrees that any change in the Number of Employees shall result in a corresponding change in the Fees payable by Client.

(ii)    Ceridian shall host and provide ongoing support for the Software and supported third party products from data centers accessible via the internet. Except for planned maintenance, the web-based application interface for the production environment that will be accessed through Client URL, shall be available, on average, 99.5% of the time each calendar month.

(iii)   For so long as this Service remains in effect, and provided that Client has paid the applicable Fees, Ceridian shall provide Support in accordance with the following:

(a)     Ceridian will use commercially reasonable efforts, commensurate with the severity of the error, to correct any malfunction, defect or non-conformity in the operation of the Software from the Documentation (each, a "Defect") to enable the Software to perform in accordance with the Documentation in effect at the time the Support is provided. Client shall report to Ceridian any Defects and Ceridian shall only be obligated to provide Support if Client submits in response to a written request by Ceridian to Ceridian all commercially reasonable information, documentation, technical and other assistance to assist Ceridian;

(b)     Ceridian shall not be obligated to provide Support if the Software is not used in accordance with the then current Documentation or if any Defect reported by Client is found by Ceridian to be due to the misuse, improper use, alteration, or damage of the Service, lack of training, or any other cause other than the Software as delivered by Ceridian. Client shall pay Ceridian, at Ceridian's then current hourly rates, for Ceridian's services in responding to a Client report of a Defect, if: (1) such Defect does not exist; (2) Client does not commercially reasonably assist Ceridian as required; (3) the Software is not used in accordance with the Documentation; or (4) the Defect is not caused by the Software. If Ceridian may reasonably correct any such Defect, Ceridian may correct it and Client shall reimburse Ceridian for such correction at Ceridian's then current hourly rates;

(c)     Support may be provided to Client named support users through one or more of a number of means at Ceridian's reasonable discretion, such as telephone, e-mail, online meeting, or Internet self-service, which includes general technical information and assistance with problem determination, isolation, verification, and resolution during Ceridian's standard hours each Business Day. Ceridian will provide after hours telephone access for Client reporting of service interruptions. Support services are not to be used as an alternative to obtaining training. Client shall make commercially reasonable efforts to refer to the Documentation as a first step in answering questions and learning functions of the Service prior to contact with Ceridian with regard to problems or questions;

(d)      A maximum of five (5) named persons (as indicated on the "Help Line" access list provided from time-to-time by Client to Ceridian) trained on the use and operation of the Software may have access to the Ceridian help line for problem resolution.  Ceridian will use commercially reasonable efforts to perform all required maintenance to the Software (or any other elements of the hardware or infrastructure necessary for the provision of the Services contemplated under this Service Exhibit) during the planned maintenance window, which is currently Wednesdays and Saturdays between 1:15 a.m. and 5:15 a.m. Eastern Standard Time.  Ceridian will use commercially reasonable efforts to keep the period during which Client's access to the system is impeded during the maintenance period to a minimum.  Ceridian will use commercially reasonable efforts to notify Client of all maintenance at least twenty-four (24) hours in advance.  Ceridian will not be responsible for any damages or costs incurred by Client, if any, for scheduled down time.  Ceridian may change its maintenance window upon prior notice to Client; and

(e)      Support provided under this Service Exhibit does not include services provided with respect to the following matters: (i) any problem resulting from configuration or customization of the Service (including any Professional Services) made by or at Client's direction and/or approval; or (ii) any problem caused by modifications of the Software not made or authorized by Ceridian (other than ordinary configuration changes the functionality for which is built into the Software and intended to be made by Client).

(iv)      Ceridian may from time to time (but shall not be required to) make changes to the Software and / or its functionality, for purposes such as maintenance or upgrades, or otherwise as deemed appropriate by Ceridian.  Such changes are within the discretion of Ceridian, and are not required to be made, and in particular (but without limitation) notwithstanding any intentions which may have been conveyed by Ceridian with respect to its possible plans for future functionality or features.

(v)      Ceridian will only provide Support in respect of Ceridian Clocks and will not provide Support or other assistance in respect of clocks or other hardware supplied by any other provider.

### 5.2.2   Client's Obligations.

(i)      Client shall continue to have all responsibilities set forth in the Agreement and, in addition, shall further ensure that: (a) all data and other materials provided to Ceridian for purposes of providing the Service shall be accurate and ready for processing; and (b) it makes available such resources as are reasonably necessary to support Ceridian's provision of the Service.   Client is responsible for all activities that occur in Employee accounts and for Employees' compliance with this Agreement.  Client shall: (a) have sole responsibility for the accuracy, quality, integrity, legality, reliability, and appropriateness of all Client data; and (b) use commercially reasonable efforts to prevent unauthorized access to, or use of, the Service, and notify Ceridian promptly of any such unauthorized access or use.

(ii)      Client may not distribute or disclose the Software, or any portion thereof, by transfer, lease, loan or any other means, or make it available for use by others in any manner.  The resale of services based on this license, or the utilization of the licensed Software in a commercial service bureau environment, are strictly prohibited.

(iii)      Client will not knowingly : (a) send spam or otherwise duplicative or unsolicited messages in violation of applicable laws; (b) send or store infringing, obscene, threatening, libelous, or otherwise unlawful or tortious material, including material that is harmful to children or violates third party privacy rights; (c) send or store any virus, worm, time bomb, Trojan horse or other harmful or malicious code, file, script, agent or program; (d) interfere with or disrupt the integrity or performance of the Service or the data contained therein; or (e) attempt to gain unauthorized access to the Service or its related systems or networks.

(iv)      Client will designate named support users to triage all internal support incidents reported by end users.  Triage occurring by Client support users includes: checking the Documentation for assistance in dealing with the reported incident, attempting to reproduce the incident in a production copy, and documenting the steps required to reproduce the incident.  Upon reporting an incident, Client agrees to cooperate, work closely with, and provide assistance to Ceridian in the investigation, diagnosis, and resolution of the incident.

(v)      Ceridian shall have the right to access Client's account from time to time, for purposes of Support, administration, invoicing and to inspect Client's utilization of the Services so as to ensure Client's compliance with the provisions of this Agreement, as reasonably necessary in Ceridian's sole discretion.

**5.3    Installation of Purchased or Rented Clocks from Ceridian**

**5.3.1  Ceridian's Obligations.**

(i)    Deliver hardware to client in good working condition prior to the scheduled installation of terminal(s).

(ii)    Make all corrections necessary to bring terminal(s) into compliance with the applicable specifications.

(iii)    If Client is current on the mandatory maintenance fees, for the clocks, provide emergency replacement of terminal(s) that Ceridian stocks in the normal course of business. The maintenance fees are included in the base rental fee for rental clocks but are payable on an annual basis for purchased clocks, NEMA clocks maintenance includes a return and repair policy rather than emergency replacement.

**5.3.2  Client's Obligations.**

(i)    Make available a suitable place of installation, adequate power and surge protection, and cabling. Client is responsible for location and mounting of the terminal in compliance with accessibility laws and all building codes.

(ii)    Install and test terminals.

(iii)    within fifteen (15) days of the receipt of terminal(s), notify Ceridian of any material defect in terminal(s). If Client does not send written notice of the occurrence of a material defect within such fifteen day time period, Client will be deemed to have accepted terminal(s).

(iv)    Client must return any rented hardware within fifteen (15) days upon termination of this agreement. Clock rental fees will continue to accrue until all hardware has been returned.

(v)    Except for NEMA clocks which may not be returned, Clients have the option to return rental or capital purchased hardware, within forty-five (45) days of receiving shipment, so long as the hardware is unopened and unused. Client is responsible for shipping costs of returned clocks. Any returns not meeting the above conditions are not eligible for a refund of fees paid.

(vi)    Rental fees will begin to accrue immediately upon receipt of the rented clocks and are required for a minimum period of twelve (12) months. Rental fees are applicable for the duration of time during which Client has the clocks in their possession. Rental fee accrual will not be terminated without an approved return merchandise authorization (rma) and will continue until Ceridian receives all clocks. If Client places the implementation on hold for any reason, clock rental fees will continue to apply.

(vii)    With the exception of NEMA clocks, if an emergency replacement of a terminal is required as part of the maintenance coverage, Client is obligated to return the original terminal within fifteen(30) days of shipment of replacement. If Client does not return the original terminal within this timeframe, Client will be charged full list price for the replacement terminal.

(viii)    Purchase Maintenance from Ceridian which provides services consisting of support, periodic updates to firmware, and updates to interfaces for the Ceridian Dayforce Workforce Management software as required. Expedited replacement of clocks is included in the maintenance plan for all but NEMA clocks. Expedited replacements will be shipped same business day if an rma is issued prior to 2:00 p.m. Eastern. If after 2:00 p.m. Eastern Standard Time, shipment will be next Business Day. NEMA clocks must be shipped to Ceridian's repair depot for repair.

**6.    OTHER SERVICE SPECIFIC TERMS**

**6.1    Service Warranty.** Ceridian warrants that for the Term, the Software shall perform in accordance with the Documentation. Client's exclusive remedies for breach of this warranty are: (i) Client may request Support from Ceridian; and (ii) if the Support requested by Client does not enable the Software to comply with the warranty within a reasonable period of time, Client may seek direct damages for the affected Software, subject to the limitations of liability in the Agreement. Ceridian shall not be liable to remedy any claimed breach of this warranty due to the acts or omissions of Client or any third party. EXCEPT FOR THE LIMITED WARRANTY SET FORTH IN THIS SECTION, THE SOFTWARE IS PROVIDED "AS-IS" AND "AS-AVAILABLE." THE EXPRESS LIMITED WARRANTIES IN THIS SECTION ARE IN LIEU OF ALL OTHER WARRANTIES AND CONDITIONS EXPRESSED OR IMPLIED, CONTRACTUAL OR STATUTORY, INCLUDING ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**6.2    Ceridian Clock Warranty.** Ceridian warrants that it has the right to sell terminal(s) to Client. Ceridian is not responsible or liable for damage, malfunction, or performance failures resulting from changes made to terminal(s) after acceptance or damage caused by the misuse, physical abuse, improper operation, the environment or other causes beyond Ceridian's exclusive control.

**6.3     Verifying Compliance.** Ceridian has the right to verify Client's compliance with the terms of this Service Exhibit (at Ceridian's own expense), at any time throughout the Term and for a period of one year thereafter, and Client shall maintain records relating to the Services hereunder for not less than such period. Ceridian will have the right, on its own behalf or through the use of a third party independent review firm, on not less than 30 days prior notice, to conduct an inspection of the relevant Client records during Client's normal business hours and in a manner that does not interfere unreasonably with Client's operations. In addition, Ceridian may require Client to complete a self-audit questionnaire relating to the Services, but in such case Ceridian reserves the right to use the normal in person verification process as set out above. If Ceridian undertakes verification and does not find Material (as defined below) unauthorized use of the Services, Ceridian will not undertake another verification of Client for at least one year. Ceridian and its third party firms will use the information obtained in compliance verification only to enforce Ceridian's rights under the Agreement and to determine whether Client is in compliance with the terms of the Agreement. By invoking the rights and procedures described above, Ceridian does not waive its rights to enforce the Agreement or to protect its Intellectual Property by any other means permitted by law. As used herein in the context of payment of any Fees or other sums due, the term "Material" means a shortage of 5% or more. If a verification or self-audit reveals any underpayment of Fees (regardless of whether Material or not), Client will promptly pay to Ceridian the amount of such shortage, together with interest from the date such amounts should have been paid, at a rate equal to the prime lending rate then in effect with Ceridian's main financial institution, plus 5%. Additionally, if the shortage in Fees is found to be Material, in addition to the above amount, Client shall also reimburse Ceridian for all costs Ceridian has incurred in connection with the verification process.

## 7.     FEES AND PAYMENT

**7.1     Fees.** The Fees payable by Client to Ceridian for the Services are as set forth in the attached Pricing Schedule. The Fees are exclusive of all Taxes. In addition to the Fees, Client shall reimburse Ceridian for all expenses (if any, in accordance with Ceridian's expense policy) incurred in connection with the implementation and provision of the Services, including travel, accommodation and meals. Except as otherwise stated herein, all invoices will be due and payable within ten (10) days of the date of invoice.

**7.2     One Time Fees.**

**7.2.1** The One Time Fees have been calculated taking into account the work and materials Ceridian has reasonably estimated will be required to implement the Service. This estimate has been made by Ceridian in good faith based on the information available to Ceridian at the time of executing this Service Exhibit, including information and representations provided by Client. Ceridian reserves the right (acting reasonably) to increase the One Time Fees to the extent that new or additional information becomes available to Ceridian which impacts the estimated One Time Fees, provided that in no event will such increase exceed thirty percent (30%) of the aggregate One Time Fees set forth in the Pricing Schedule. In such case, Ceridian will provide Client with written notice of the increase, specifying the reason for such increase, as soon as reasonably practical during the discovery phase.

**7.2.2** Subject to any payment terms to the contrary in the Statement of Work, the One time Fees will be invoiced and payable in 2 installments as follows: (a) fifty percent (50%) at the date Implementation Services are started (generally by way of a kick off meeting) and (b) fifty percent (50%) at Service Start Date. However, Ceridian reserves the right to invoice and require payment of One Time Fees on a monthly basis (including for longer / more complex implementations), based on the amount of work completed each month. All One Time Fees in respect of purchased or rented clocks, badges or other tangible items or hardware, will be invoiced upon shipment.

**7.3     Recurring Fees.**

**7.3.1** The monthly Recurring Fees will be invoiced and payable monthly in advance, commencing as of the Service Start Date (subject to Section 7.3.2 below), based on the Number of Employees as at the 15th of each calendar month, or other such date as may be communicated to Client by Ceridian. All invoices are payable within ten (10) days of the date of invoice. Any estimated annual Fees shown in the Pricing Schedule are estimates only, based on Client's Number of Employees as at the date of signing this Service Exhibit.

**7.3.2** Once Ceridian commences those Implementation Services described in Section 3 above, a Client instance of the Software is established for the purposes of configuration, user testing and implementation team training. In order to compensate Ceridian for the work required to establish and maintain such Client environment prior to the Service Start Date, Client shall pay Ceridian, commencing as of the date Ceridian commences Implementation Services, through to the Service Start Date (the *"Pre-Production Period"*), a pre-production monthly Recurring Fee equal to 50% of the regular monthly Recurring Fees. This monthly Pre-Production Period Fee will be based on the actual number of Client employees as at the date the Service Exhibit is signed, regardless of the actual Number of Employees loaded into the Software during the Pre-Production Period.

7.3.3   Maintenance or similar Recurring Fees payable in respect of clocks, badges or other tangible items or hardware ("*Maintenance Fees*"), will be billed once per year, commencing on the date such hardware is shipped to Client and on every anniversary thereof.

7.3.4   SMS text messaging for "Alerts and Notifications" functionality is available to Client at Ceridian's then current rate per message (both outbound and inbound messages shall be counted for the purposes of billing). Such fees shall be billed based on the actual count for the previous month.

**7.4    Order of Precedence.**  The parties expressly acknowledge and agree that the Fee amounts, payment terms and other concepts set forth in this Section 7 shall apply to the WFM Services described herein regardless of any conflicting or additional terms or conditions relating to fees as may be contained in other parts of this agreement (including without limitation, the general "Fees and Payment" Section 4 of the Agreement).

## 8.    ADDITIONAL PROVISIONS

**8.1    Publicity and References.**  For marketing purposes, Ceridian shall be at liberty to advise its clients and potential clients (directly or through marketing materials) of the fact that Ceridian provides the Services to Client (but, for certainty, without disclosing any business or other confidential terms of this Agreement).  In this regard, Client agrees that Ceridian may include Client's name or logo in a list of its clients, provided that any use of Client's trade-mark(s) must retain any proprietary notices and/or are properly attributed to Client.  Client shall, if so requested by Ceridian, make available to Ceridian (and such clients or potential clients), a representative of Client to act as a reference for Ceridian, and to answer questions and generally provide information to such clients or potential clients of Ceridian regarding the Services and Ceridian's provision thereof.  Client further agrees to reasonably co-operate with Ceridian with respect to providing any further reference information or resources as may reasonably be requested by Ceridian from time to time.

**8.2**    Without limiting the generality of Section 8.1, Client agrees to: (a) provide quotations and approve press releases announcing Client as a new client of Ceridian or announcing Client's successful go-live with the Online Service; (b) allow Ceridian to include a brief description of the Services furnished to Client in Ceridian promotional materials; (c) assist Ceridian in developing a case study, ROI analysis, white paper and/or related marketing materials ("*Marketing Materials*"); (d) provide interviews to the news media; (e) organize mutually convenient site visits for Ceridian potential clients; and (f) make presentations at conferences.  The consent of both Parties shall be obtained prior to the release of any press releases or Marketing Materials, which consent shall not be unreasonably withheld, conditioned, or delayed.

> In consideration of the Fees to be paid hereunder, Client hereby requests that Ceridian provide those Services in accordance with the terms and conditions set forth in this Service Exhibit, any conflict between the terms of Service Exhibit and any other term in the Agreement shall be governed by this Service Exhibit with respect to the WFM Services described here in.  This Service Exhibit may be executed either contemporaneously or subsequent to the Agreement, and in either case the terms of this Service Exhibit shall be deemed to be incorporated into and form an integral part of the Agreement.  In the latter case where subsequently executed, the Agreement shall be considered amended by adding the provisions of this Service Exhibit, and to the extent this Service Exhibit does <u>not</u> modify the Agreement, the Agreement shall continue in full force and effect, unamended, and otherwise the execution of this Service Exhibit will not serve to revise the relationship between the Parties and any unremedied and outstanding accounts, breaches or other matters existing between the Parties as at the date this Service Exhibit is executed will remain intact and subsisting notwithstanding the amendment of the Agreement.

Dated as of the   27th   day of   December   , 2012.

**Ceridian Corporation**

Per:  _A. E. Olson_
             (Signature)

Print Name:  _Raymond E. Olson_

Title:  _V.P._
         I have the authority to bind the corporation.

**Chumash Casino Resort Enterprise**

Per:  _Slumentin_
             (Signature)

Print Name:  _C. Clearwater_

Title:  _CFO_
         I have the authority to bind the corporation/partnership.



**CERIDIAN CORPORATION ("Ceridian")**

**SERVICE EXHIBIT**

**CERIDIAN ADDITIONAL SERVICES**

FOR INTERNAL USE ONLY

Agreement ID: _____
Sales Person: _____
Sales ID: _____
Payroll No (if applicable): _____

**ANTICIPATED SERVICE START DATE:** July 1, 2013

**TERRITORY: United States**

| CLIENT INFORMATION | | | | |
|---|---|---|---|---|
| Client Name **Chumash Casino Resort Enterprise** | | | the "Client" | Current # of Employees 1,750 |
| Service Contact | Phone No. | Fax No. | e-mail | |
| Alternate Contact (Optional) | Phone No. | Fax No. | e-mail | |

**1.    SERVICE EXECUTIVE SUMMARY**

Ceridian shall provide Client with the following additional services in accordance with the terms of the Agreement and the Fees set forth on the Pricing Schedule.

**2.    CERIDIAN PAYROLL CARD SERVICE**

   **A.    As used in this Section:**

   (i)   "Agreement" means the Agreement for Products and Services between Ceridian and Client, together with any exhibits, schedules and attachments.

   (ii)  "Business Day" means any day that is not a Saturday, Sunday or legal holiday and on which banking institutions in the city of Nashville, Tennessee, are open for business.

   (iii) "Card" means the MasterCard branded payroll card or non-branded PIN based payroll card.

   (iv)  "Cardholder" means an employee of Client who has been provided a Card for receipt of the employee's net wages from the Client.

   (v)   "Comdata" means Ceridian's Affiliate, "Comdata Network, Inc.", a Maryland corporation.

   (vi)  "Client" means a U.S.-based commercial business that is a customer of Ceridian.

   (vii) "Issuing Bank" means the MasterCard member that issues the Cards for the Program. Initially, the Issuing Bank will be Regions Bank.

   (viii) "Networks" means the MasterCard, CIRRUS and Maestro debit networks, or substitute networks

   through which the Cards are accepted.

   **B.  Service.** The Payroll Cards service is a funds distribution service whereby Clients may distribute payroll to their employees. Funds are distributed by means of Cards, which access the Networks. The Cards are issued by Issuing Bank and serviced by Comdata. The Service is provided in accordance with Network rules, and Client's use of the Service is subject to approval for conformance with Network rules. The Service may be modified from time to time as necessary to remain in compliance with Network rules and applicable laws.

C. **Funding of Cards.**

**(i)** Pre-Funding: Client shall transfer to Comdata by ACH, as outlined in the Funding Authorization Form (attached hereto and incorporated by reference), in immediately available funds, the aggregate amount of funds to be loaded onto Cards along with information, in form and substance determined by Ceridian and/or Comdata (which may include electronic file(s) or data feeds), identifying each Cardholder and the amount of funds allocated to the Cardholder. Failure of Client to timely make funds available to Comdata or to provide to Comdata any information required to effect the Service may cause the funds to be unavailable to Cardholders at the time(s) requested and is a material breach of this Agreement. Client will submit an ACH file, created by Ceridian, using Comdata's ABA and transit routing number. This process is considered a pre-funded load. Comdata is funded for the principal amounts loaded onto Cards at the time Comdata receives the ACH file from its bank through the ACH system. In the event Client loads the incorrect amount to a Card, Client must send an ACH reversal to reverse the entire amount loaded to the particular Card and resubmit a new load amount via ACH.

**(ii)** Off-Cycle Loads: In the event that Client needs to load funds to a Card outside of the normal payroll period (an off-cycle load), subject to Section H below, Client may submit a file directly to Comdata and is not required to use the ACH load process described above. Client will receive an invoice for the amounts loaded directly.

**(iii)** Payment of Comdata Invoices: Client will receive daily invoices for amounts due to Comdata (e.g. off-cycle loads). In the event that Client disputes an invoice, then Client shall notify Comdata immediately, and the parties shall cooperate to resolve the dispute in a timely manner. Comdata invoices will be paid by Comdata initiated ACH of Client's bank account, and Client must complete an ACH Authorization Form.

**(iv)** Funds Held in Trust: Funds transferred to Comdata in connection with the Service will be deposited and held in an irrevocable trust account (non-interest bearing as to Ceridian, Clients and Cardholders) located at Regions Bank, or such other bank or financial institution designated from time to time by Comdata, as trustee, pursuant to a trust agreement existing between Comdata and the trustee for the benefit of each Cardholder. Cardholder's funds are eligible for FDIC insurance (on a per-person, "pass-through" basis) for the maximum coverage amount.

D. **Payroll Distribution.** For purposes of this Agreement, the parties acknowledge and agree that the Cards are "payroll card accounts" as defined in Regulation E (12 CFR Part 205). Client represents, warrants and covenants as follows:

(i) Client represents, warrants and covenants that it will not distribute unsolicited Cards to employees, and that it will not distribute payroll to employees via Cards without providing each employee a copy of Comdata's Cardholder Agreement supplied with the Card, and the Payroll Card Fees disclosure form.

(ii) Client will comply with applicable laws and the regulations of government bodies such as but not limited to the Office of Foreign Assets Control and the Financial Crimes Enforcement Network ("FinCEN"). In accordance therewith, Client shall: (i) verify the identity of each Cardholder using a process at least as stringent as the I-9 process; (ii) collect and transfer to Comdata each Cardholder's name, address, date of birth, and Social Security Number (or Taxpayer Identification Number if the Cardholder does not have a SSN). Comdata may refuse to issue or load a Card for which the required information has not been provided, where Comdata has not been able to independently verify the identity of a Cardholder, or where Comdata has determined that a Cardholder represents an unreasonable risk (e.g. the Cardholder appears on a prohibited persons list).

(iii) Client is solely responsible for compliance with all applicable federal, state and local laws, rules and regulations relating to payroll, compensation and employment matters, including, without limitation, proper withholding, and timely remittance of, any and all taxes related thereto (e.g., local, state and federal income, payroll or social security taxes), and Client agrees to indemnify and hold harmless Comdata and its affiliates, Issuing Bank and its affiliates, Ceridian and their respective officers, directors and agents, from any and all liabilities, including interest and penalties, which are or

may be imposed on any of them pursuant to any such laws. Client's obligations under this subsection shall survive the termination or expiration of this Agreement, regardless of whether any such liabilities arise before or after the effective date of any such termination or expiration.

Ceridian, Comdata and their designees have the right to audit Client for compliance with the terms of this subsection D during reasonable business hours and with advance notice at no cost to Client.

**E. Responsibility for Cards, Etc.** Client accepts full responsibility for the use of Cards, passwords or other security codes and procedures for accessing the pay card systems that are in Client's possession or control. Client shall notify Comdata and/or Ceridian immediately by telephone of any loss, theft, unauthorized use or fraudulent use of such Cards or security procedures and shall be fully responsible for the unauthorized or fraudulent use thereof until such time as Comdata and/or Ceridian has received such notification from Client, provided that such fraud or misuse is not directly attributable to Ceridian or Comdata.

**F. Cardholder Transactions.** Comdata is requested and authorized to cause transactions with the Cardholder's funds to be completed in accordance with the Cardholder's instructions and to pay the principal amount of the transactions, including any fees associated therewith, to the appropriate party or parties. Client shall encourage Cardholders who stop getting funds distributed through the Service to use their remaining Card balances in a timely manner.

**G. Credit Limit and Security.** Ceridian will establish a credit limit for Client, which is subject to periodic review and adjustment by Ceridian. Client shall provide Ceridian with such financial information as Ceridian may reasonably require to review Client's credit limit and authorizes Ceridian to make any credit investigation Ceridian deems necessary and appropriate. If requested by Ceridian from time to time, Client shall provide Ceridian with security for the credit limit. Ceridian may refuse to extend credit until such time as any such security is received by Ceridian in form and substance acceptable to Ceridian in its discretion. If Client exceeds its credit limit, then Ceridian may request immediate payment, request additional security, suspend further Service (except Cardholder transactions), and assess Ceridian's standard overlimit fee.

**H.    Additional Terms.**

(i) **Confidentiality.** In addition to Client's Confidentiality Obligations set forth in the Agreement, Client agrees that it shall not, during the term of this Agreement or at any time after the termination or expiration hereof, use or disclose to any third party the rates, terms and conditions of this Agreement, the confidential and proprietary information of Comdata or Issuing Bank, including, but not limited to the pay card system technical information and the processes and procedures of the pay card system. Client will appoint designated representatives to have authorized access to Client's account with Comdata. Such representatives shall access the account only as required to administer Client's Card program and for no other purpose. Client acknowledges and agrees that all account and transaction information is confidential, and Client shall not divulge this information to any other person or entity. The provisions of this section shall not apply to disclosures required by law.

(ii) **Limitation of Liability.** Neither Comdata nor Issuing Bank shall be liable for any failure of the Service due to acts of God, acts of government or the Networks or regulatory bodies which significantly inhibit or prohibit the Service, wars, acts of terrorism, fires, floods, explosions, natural catastrophes, civil disturbances, strikes, riots, unusually severe weather (such as tornadoes), or failures or fluctuations in electrical power, heat, light, air conditioning, computer or telecommunications services or equipment or any other cause not within the reasonable control of Comdata or Issuing Bank, as applicable. CLIENT'S SOLE REMEDY SHALL BE DIRECT MONEY DAMAGES, AND IN NO EVENT AND REGARDLESS OF THE CAUSE OF ACTION OR LEGAL THEORY SHALL COMDATA'S AGGREGATE LIABILITY FOR THE TERM OF THIS AGREEMENT EXCEED THE "CARDHOLDER FEES" RECEIVED BY COMDATA DURING THE TWELVE (12) MONTH PERIOD PRECEDING THE INITIAL CLAIM OF LIABILITY. IN NO EVENT SHALL COMDATA OR ISSUING BANK BE RESPONSIBLE FOR DIRECT, INDIRECT, CONSEQUENTIAL, SPECIAL, INCIDENTAL OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER THEY WERE MADE AWARE OF THE POSSIBILITY OF SUCH DAMAGES. COMDATA, CERIDIAN AND ISSUING BANK MAKE NO REPRESENTATIONS OR WARRANTIES

REGARDING THE SERVICES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

**(iii)    Term and Termination.** In addition to the termination rights set forth in the Agreement, this Service may be terminated immediately in the event that the Networks prohibit the Service, the Issuing Bank ceases to be a Network member or the Issuing Bank ceases to be the Card Issuer, provided that Comdata or Ceridian shall endeavor to provide Client with advance notice of any such event. This Agreement also may be terminated if there has been no activity on Client's account for a period of one year or longer. This Agreement may be terminated upon thirty (30) days prior written notice with respect to any individual state or jurisdiction if it is demonstrated, with documentary support, that changes in applicable laws or regulations or the interpretation thereof will make the Service not commercially feasible.

**(iv)    Indemnification.** Client shall indemnify and hold harmless Comdata and its affiliates, Ceridian, Issuing Bank and its affiliates, and their respective officers, directors and agents, from any and all claims for damages, losses or liabilities arising from the negligent and willful acts or omissions any person who is given authorization by Client to use Cards, codes, passwords or other security codes or procedures to access the pay card system, or from the material breach by Client of its express obligations under this Exhibit.

**(v) Third Party Beneficiary.** Client and Ceridian each acknowledge and agree that Comdata shall provide the Services hereunder on behalf of Ceridian and Ceridian and Client each agree that Comdata is a third party beneficiary to the Agreement and as such has the right to enforce the provisions of the Agreement against Client as if Comdata were a party thereto.

## 3.    CERIDIAN RECRUITING SOLUTIONS

CRS will provide Client with the Ceridian Recruiting Solutions ("CRS") service and access to associated web-based software ("Service"). Ceridian Recruiting Solutions is an Internet-based Applicant Tracking system that manages the requisition process, job postings to Client's corporate website, direct applicant submission through the website to the database, and automated contact management, accessible through a unique username and password.

Client shall have the option to migrate to the Ceridian Dayforce Recruiting Module at no additional cost when the Recruiting Module is generally available to other Ceridian customers. Ceridian makes no representations or guarantees as to the features or functionality to be included in the product and Ceridian makes no representations as to the actual date of availability of the general release version.

### 3.1 Implementation

**(A) CRS Obligations:** (1) provide implementation services in preparation for Client's use of the Service which shall be facilitated by an implementation consultant via telephone and electronic communication; (2) send a welcome email to Client which shall include a contact list with telephone numbers for technical support, user manual, and system set up instructions; (3) send access information to Client via email once the Service is configured.

The job board and candidate application web pages for Client's website will be created to include Ceridian's "Powered by Ceridian" logo. The career page will be configured to be pulled into a Client's frameset.

**(B) Client Obligations:** (1) provide reasonable access to functional and technical personnel in order to set-up the Client's system; (2) provide a single point of contact for project management during system implementation; (3) enter system data unless otherwise stipulated in this Agreement; (4) attend implementation meetings when mutually agreed upon.

Client shall have a (30) day acceptance period upon system delivery in which to document, in writing, any issues with the system. In the absence of communication from Client during this acceptance period, the system will be deemed "accepted", and monthly hosting fees will commence.

### 3.2 Training

a) **CRS Obligations:** (1) provide client with access to all Web-based training upon completion of Implementation. Such training provides sufficient information about the system to allow users to function within the system. Additional training can be purchased at the then current Ceridian rate.

### 3.3 Client Support

(A) **CRS Obligations:** (1) provide support at the following levels: (a) Phone Support: unlimited hours of toll free phone support per month; (b) Email Support: unlimited email support. Support is provided Monday through Friday, 9:00 AM – 7:00 PM Eastern Time, excluding U.S. holidays.

(B) **Client Obligations:** (1) provide a single point of contact for technical support escalation; (2) report errors in a detailed manner, and within a reasonable timeframe.

### 3.4 Service Availability and Security:

CRS will use reasonable commercial efforts to make the software available seven (7) days a week, twenty-four (24) hours a day. CRS does not guarantee uninterrupted access to the Service. CRS shall ensure uptime of 99.5% monthly.

Client recognizes and accepts the risks associated with communicating by the Internet. Client also acknowledges that data input by Client will be transferred via the Internet cross border to the United States if Client is using these Services outside of the United States.

Services include the following security: every Client has their own database, all data resides behind a hardware firewall, a unique encrypted cookie code is generated for each user and session based on specific user level access permissions. Copies of Client's data will be provided to Client upon request at the then current Ceridian rate. Ceridian utilizes two methods of secure transmission; SFTP to SFTP and SFTP to FTP utilizing PGP encryption. To receive recruiting data Client must provide a secure mechanism to receive the requested data based on one of the methods described above.

---

In consideration of the Fees to be paid hereunder, Client hereby requests that Ceridian provide those Services in accordance with the terms and conditions set forth in this Service Exhibit, any conflict between the terms of Service Exhibit and any other term in the Agreement shall be governed by this Service Exhibit with respect to the Additional Services described here in. This Service Exhibit may be executed either contemporaneously or subsequent to the Agreement, and in either case the terms of this Service Exhibit shall be deemed to be incorporated into and form an integral part of the Agreement. In the latter case where subsequently executed, the Agreement shall be considered amended by adding the provisions of this Service Exhibit, and to the extent this Service Exhibit does <u>not</u> modify the Agreement, the Agreement shall continue in full force and effect, unamended, and otherwise the execution of this Service Exhibit will not serve to revise the relationship between the Parties and any unremedied and outstanding accounts, breaches or other matters existing between the Parties as at the date this Service Exhibit is executed will remain intact and subsisting notwithstanding the amendment of the Agreement.

---

Dated as of the ___27___ day of ___December___, 2012.

**Ceridian Corporation**

Per: _R. F. Olson_
　　　(Signature)

Print Name: _Raymond E. Olson_

Title: _V.P._
　　　I have the authority to bind the corporation.

**Chumash Casino Resort Enterprise** Error! Reference source not found.

Per: _Clearwater_
　　　(Signature)

Print Name: _C. Clearwater_

Title: _CFO_
　　　I have the authority to bind the corporation/partnership.

**Pricing Schedule - United States**
December 21, 2012
This confidential quotation has been prepared exclusively for Chumash Casino Resort  by Josh Fray



**Bundle Purchased:  Pay, Benefits & WFM**

| Item Description | Rate | Quantity | Charge |
|---|---|---|---|
| **Estimated One Time Charges** | | | |
| Dayforce HCM Bundle Pay, Benefits & WFM Implementation Fee | $116,123.00 | 1 | $116,123.00 |
| Dayforce WFM - Maximus Biometric Clock w/ no Reader | $2,200.00 | 15 | $33,000.00 |
| Dayforce WFM Clock Shipping & Handling Fee | $25.00 | 15 | $375.00 |
| Recruiting Center Core Product Implementation Fee MH-TM-26 | $8,500.00 | 1 | $8,500.00 |
| Customer-exclusive virtual WFM system administration -1 day (max of 12 students) | $1,200.00 | 1 | $1,200.00 |
| Customer-exclusive virtual WFM train-the-trainer – 1 day (max of 12 students) | $1,200.00 | 1 | $1,200.00 |
| Develop custom training materials for WFM (workbooks and employee job aids) | $8,000.00 | 1 | $8,000.00 |
| Customer-exclusive virtual administrator training for Payroll, Benefits and Self Service – 4 days (max of 12 students per day) | $10,000.00 | 1 | $10,000.00 |
| Custom Self Service forms and workflow development | $10,000.00 | 1 | $10,000.00 |
| Data Conversion Services Time Fee | $150.00 | 100 | $15,000.00 |
| | | | **$203,398.00** |

| | | | |
|---|---|---|---|
| **Estimated Monthly Charges** | | | |
| Dayforce HCM Bundle Pay & Benefits Subscription Fee* | $12.00 | 1,750 | $21,000.00 |
| Dayforce WFM Advanced Subscription Fee * | $4.00 | 1,750 | $7,000.00 |
| Dayforce WFM Attendance Tracking Monthly Fee* | $0.50 | 1,750 | $875.00 |
| Dayforce WFM Schedule Bidding Monthly Fee* | $0.50 | 1,750 | $875.00 |
| Dayforce WFM Shift Trading Monthly Fee* | $0.25 | 1,750 | $437.50 |
| Dayforce WFM Forecasting and Opt Scheduling Monthly Fee* | $0.00 | 1,750 | $0.00 |
| Recruiting Center Core Product Repetitive Fee MH-TM-26 | $0.70 | 1,750 | $1,225.00 |
| Additional State Tax Filing Ids (Quantity Shown Includes One Free) | $10.00 | 9 | $90.00 |
| Additional Federal Tax Filing Ids (Quantity Shown Includes One Free) | $55.00 | 4 | $220.00 |
| | | | **$31,722.50** |

* The pre-production discount of 50% is applied to the monthly recurring fee from project kick-off until go-live.

| | | | |
|---|---|---|---|
| **Estimated Annual Charges** | | | |
| Dayforce WFM - Maximus Biometric Clock Premium Annual Maintenance (hot swap) | $325.00 | 15 | $4,875.00 |
| | | | **$4,875.00** |

| | | | |
|---|---|---|---|
| **Fees For Service** | | | |
| Dayforce Printed Check Fee | $0.15 | | |
| Dayforce Printed Direct Deposit Advice Fee | $0.15 | | |
| Printed W2s | $0.15 | | |

| | |
|---|---|
| **Estimated One-Time Fees:** | **$203,398** |
| **\* Estimated Annual Repetitive Fees:** | **$385,545** |

* Does not include any applicable price increases.

Prices shown here are valid only if this agreement is signed by the client within 30 days from the date above.

Standard payment terms are Net 10 days.

The prices contained herein are based on estimated quantities at the time of contracting. Fees will be calculated using actual employee counts.

**Standard Features of Dayforce Payroll include:**

HR/Payroll Functionality and Hosting, Payroll Processing, Tax Filing (1 Fed, 1 State and 1 Local ID included. Additional IDs incur a monthly per ID fee), Payroll, Preview, General Ledger, Direct Deposit, Ceridian Check, Payroll Cards, New Hire Reporting, Wage Attachment Calculations & Disbursements, Self Service, W2s Online, Year-End Processing, Standard Dayforce HCM Reporting

Goods and/or materials, if any, shipped FOB Origination Point

Ceridian Payroll Card includes training materials, Core Training Sessions (Train-The-Trainer), Client Support (CSRs), and VRU and Live Bi-Lingual Customer Service.

Additional fees may apply for Ceridian Payment Solutions, Ceridian Check, Ceridian Direct Deposit and Wage Attachment Disbursements. Additional fees apply for items such as stop payments, check photocopies, file reversals, incoming wire transfers and non-sufficient fund transactions.

THIS AGREEMENT BECOMES EFFECTIVE ON THE DATE SIGNED BY CLIENT AND AGREED TO BY CERIDIAN ("THE EFFECTIVE DATE"). THE SERVICES IDENTIFIED IN THIS DOCUMENT WILL BE FURNISHED PURSUANT TO THE TERMS AND CONDITIONS OF THE AGREEMENT(S) BETWEEN CLIENT AND CERIDIAN CORPORATION.

CURRENT SERVICES NOT DETAILED HERE WILL CONTINUE TO BE DELIVERED AT CURRENT INVOICE RATES UNTIL FURTHER NOTICE.

Agreed to and accepted by:                                                  Agreed to and accepted by:
Chumash Casino Resort                                                       CERIDIAN CORPORATION

**Pricing Schedule - United States**
December 21, 2012
This confidential quotation has been prepared exclusively for Chumash Casino Resort  by Josh Fray

CERIDIAN

By: *R. E. Olson*

By: *Clearwater*

Name: *Raymond  E.  Olson*

Name: *C. CLEARWATER*

Title: *V. P.*

Title: *CFO*

Date: *12/28/2012*

Date: *12/27/12*



STATEMENT OF WORK #
IMPLEMENTATION SERVICES

**EFFECTIVE DATE:  December 10, 2012**

| CLIENT INFORMATION | | |
|---|---|---|
| Client Name | | |
| **Chumash Casino Resort Enterprise** | | (the "Client") |
| Phone No. | Fax No. | e-mail |

This is the Implementation Statement of Work ("*SOW*") as contemplated under the written Service Exhibit for Ceridian Dayforce Human Capital Management made between Ceridian and the Client (the "*HRP Exhibit*").  This SOW sets forth the details for the Implementation Services and/or deliverables (the "*Implementation Services*") to be provided in respect of those Services and modules described in the HCM Exhibit (the "*Services*").  Capitalized terms not defined in this SOW shall have the meanings ascribed to them in the Agreement.

1.     Executive Summary

You have engaged Ceridian to implement the following modules:

- Dayforce Core Elements
- Dayforce HR & Self-Service
- Dayforce Payroll
- Dayforce Benefits
- Dayforce Time
- Advanced WFM Modules
  - Task Management
  - Attendance Tracking
  - Shift Trading
  - Schedule Bidding
  - Labor Forecasting and Optimized Scheduling

For the following population:

- 1,750 Employees at 5 locations in the United States

Statement of Work

2.    Implementation Phases

The tasks, duties, responsibilities, and deliverables to be provided by Ceridian to Client in connection with the Implementation Services will be provided in 3 high level phases, which are broken down as follows:

   (i) *Discovery:*
   • Deliver pre-discovery workshop questionnaires;
   • Lead discovery workshops;
   • Document requirements and deliver a Requirements Recap document;
   • Determine integration requirements for selected components (as appropriate).

   (ii) *Configuration and Testing:*
   • Configure the solution per the written document titled "Requirements Recap" for all of the Client's 'in scope' locations as agreed upon by Ceridian and the Client;
   • Provide the solution based on Client feedback during sandbox (test environment) review;
   • Complete parallel testing for payroll components; and
   • Refine solution, support client user acceptance testing and final parallel runs.

   (iii) *Knowledge Transfer:*
   • Support one live production run per frequency;
   • Knowledge transition session to transfer knowledge on the specifics of Client's system to administrators, payroll department, human resources department and help-desk.


3.    Estimated Project Timeline

Ceridian's timeline to complete the Implementation Services generally ranges from 12 – 22 weeks, depending on the complexity of the client organization and the modules selected. The specific Project Timeline for the Client will be delivered to the Client during the discovery process.


4.    Services, Responsibilities and Deliverables

(a)    In Scope Work:  Ceridian will analyze, configure, test and deliver those solution elements indicated below with an "X"):    ***(Mark an "X" in Applicable Boxes)***

| Component | Description | Scope |
|---|---|---|
| **Dayforce Core Elements** | | |
| ☒ Organizational Hierarchy | *The organization hierarchy is used for security access to filter data appearing to the user so that the information available to each user in the application is appropriate. For example, the organization hierarchy controls that the manager of a location can only review the HR and time and attendance records for employees who work at that location, and can only create schedules, approve timecards and submit transactions for employees at that location.* | Up to 50 Departments Included |
| ☒ Role Security | *User roles are a security feature that defines what sections of the application users can access. Clients can configure as many user roles as the organization requires; the more granular the access requirements, the more user roles required. Typical roles include: employee, supervisor, manager, administrator, etc.* | Up to 6 Roles Included |
| ☒ Pay Groups | *Pay groups define the frequency of pay for a group of employees. The pay group's pay periods takes into account:*<br>*- How often employees are paid;*<br>*- The duration of time managers review and approve each period;*<br>*- The duration the period's payroll rules consider.*<br>*Pay periods should be aligned with period payroll rules.* | Up to 3 Pay Groups included |
| ☒ Ad Hoc Reporting | *In addition to the reports available through Dayforce, Client can create reports based on the information recorded within the application through MyReports. These ad hoc reports are based on topics, such as pay or HR information, and can report on any selected fields included in the topic; the report can then be filtered based on these fields and distributed through the application to any user role(s) that should have access to run the report. Configuration of ad-hoc reports on client's behalf is available for an additional fee based on discovery.* | |

| Component | Description | Scope |
|---|---|---|
| ☒ HR Administration Configuration | Configuration of client driven lists for status, employment status reasons, pay class, pay types, relationship types, contact information types, marital status, and employee properties.   Configuration of new hire role assignment, HR role security, and employee data mapping rules. | |

### Dayforce HR & Self-Service

| Component | Description | Scope |
|---|---|---|
| ☒ Time Away From Work | Employee level users system access to make Time Away from Work Requests based on imported or calculated Entitlement balances; Manager Time Away From Work (TAFW) request approval screen | |
| ☒ Entitlements | Entitlements are used to control how employees earn balances that represent their benefits, such as vacation time or personal days | Up to 2 included |
| ☒ Administrator Self Service Forms | Workflow Editor, Workflow Management, Policy Acknowledgement Admin, Org/Job Changes, Choice Lists, Form Submission History, Delegation, My Reports, Guided Process Configuration Screen. Customer-specific forms are available for an additional fee based on discovery. | |
| ☒ Manager Self Service Forms | Termination, New Hire, Request and Return from Leave, Position Change, Position & Compensation Change, Form Submission History, My Reports. Customer-specific forms are available for an additional fee based on discovery. | |
| ☒ Employee Self Service Forms | Name and Marital status, Address, Request a Leave, Emergency Contacts, Tax Forms, Direct Deposit Form, Confidential Information Form, Form Submission History, My Profile, HR Policy. Customer-specific forms are available for an additional fee based on discovery. | |
| ☒ Workflows | Standard workflows include: commit to database, single approval, double approval & conditional workflow. Implementation will configure additional workflows to mirror your organization's unique business processes for an additional fee based on discovery. | 4 Standard Workflows Included |
| ☒ Guided Processes | Wizard-like collections of forms with configurable start and end messages to manage work and life events. This includes First Day Guided Process. | Up to 3 included |
| ☒ Message Center | Configuration of the message center feature and permissions by role allows users to communicate with one another, and receive alerts and notifications within the application; includes mobile. | |
| ☒ Earning Statements | This feature allows employees and Administrators to view & print their earning statements within the application.  Earnings summaries are viewable on the employee's mobile devices.  Includes earning statement import for clients not using Dayforce Payroll. | |
| ☒ Mobile Access | Access to Dayforce from Android or iOS mobile devices | |
| ☒ Payroll Card Requests and History | This feature allows the HR/Payroll Administrator to issue a Ceridian branded MasterCard instant issue or personalized Payroll Card and approve the employee's request for a personalized MasterCard Payroll Card. The employee can view their Ceridian Payroll Card current balance and transaction history from within the application and on mobile devices with no fee to the customer or employee. | |

### Imports and Interfaces

| Component | Description | Scope |
|---|---|---|
| ☒ Current Year Employee Record Import | Importing employee records for all current year employees which includes: name, address, contact information, emergency contacts, confidential information, status, direct deposit, work assignment, and rate of pay. | Includes current year records |
| ☒ Current Year Inactive & Terminated Employee Record Import | Importing employee records for inactive and terminated employees which includes: name, address, contact information, emergency contacts, confidential information, status, work assignment, and rate of pay. | Includes current year records |
| ☒ Current Employee Balance Import | Loading of current active employee outstanding balance amounts | Includes current balances |

| Component | Description | Scope |
|---|---|---|
| ☒ Current Employee Earning & Deduction Elections Import | Loading of current active employee permanent recurring earnings and deductions | Includes current elections |
| ☒ Current Year Check History Import | Loading of most recent year-to-date values for check history | Includes current year history |
| ☒ Current Employee Tax Filings | Loading of current employee tax parameters (e.g., exemption amounts, number of exemptions, etc.) | Includes tax filings for current employees |
| ☒ Payroll HR History Import Prior Years | Import of prior years' HR history data. | Up to 7 years included |
| ☒ Payroll Check History Import | Import of check history detail for current or prior years | Up to 7 years included |
| ☒ Earning Statement History Import | Import of prior years' earning statement data for employee viewing. | Up to 7 years included |
| ☒ Data Conversion Services | Extraction and formatting of transactional data from your prior system, including Wage Attachments. | Up to 7 years included |
| ☒ Interface Configuration | Configuration of interfaces within the framework of the Dayforce application. These include carrier feeds, GL exports, time imports, etc. | Includes Interfaces listed Below<br><br>1 – GL Export<br><br>3 – 3rd Party Exports<br><br>4 – 3rd Party Imports<br><br>3 – 401K Exports |

| **Dayforce Payroll** | | |
|---|---|---|
| ☒ Payroll Preview | Preview of payroll calculations for the pay group and for each employee. Includes online analytics, standard Payroll Audit Reports and audit wizard, Quick Entry screen for one time payroll related entries, Separate Check generation. | |
| ☒ Payroll Codes | Including Earnings, Deductions, Memo Calculations, and Taxable Benefits; Also the setup of Earning and Deduction Groupings that can be utilized for earnings or deduction calculations; Pre-defined tax methods built in for compliance purposes(US); Pre-defined System earnings and deductions with validated tax calculations (CDN),Configurable limits and declining balances; Arrears tracking and recovery | Up to 100 codes included |
| ☒ Payroll Policy | Dictates the order in which payroll is processed & Auto Pay is applied | Up to 1 policy included |
| ☒ Payroll Configuration | Includes mapping of tax forms, configuration of check template including logo and check signature, setup of client's payroll addresses & contacts, and configure bank holidays | Included |
| ☒ Legal Entity | Creation of Legal Entities (FEIN, BN) for the proper calculations and remittance of tax filing. Including federal, state/provincial, local, and other employer & employee taxes Automatic compilation of required tax jurisdictions based on work location | Up to 5 entities included |
| ☒ Employer Bank Accounts | Bank account information is needed to fund payments for your payroll accounts, including employee payments, taxes, 3rd party payments and service charges. | Up to 1 account per FEIN included |
| ☒ Ceridian Tax Filing | Preparation and filing of: US - Federal, State, and Local tax return and related documentation | Includes 5 Federal and 10 State and 0 Local Filings |
| ☒ Ceridian Direct Deposit | Ceridian collects the payroll funds from your payroll account with a single debit. Ceridian sends the direct deposits to their employees' bank accounts or add funds to their Ceridian Payroll Card. | |

4

| Component | Description | Scope |
|---|---|---|
| ☒ Ceridian Check | Ceridian collects the payroll funds from your payroll account with a single debit and provides checks for your employees paid from a Ceridian bank account. | |
| ☒ Ceridian Wage Attachment Disbursements | Creation of 3rd party payments electronically or by cheque/check if available. Disbursement of the withheld funds to the proper payee if available. Customer will complete garnishment records for employees. | |
| ☒ Deferred Compensation and Pension Plans | Setup and calculation of deferred compensation plans including Pension Plans, 401(k) and 403(b), Roth, catch-up and employer matches | Up to 3 plans included |
| ☒ Workers Compensation | Setup of Workers Comp accounts and rates, linking those rates to jobs and positions, and creating Works Comp Reporting. | |
| ☒ 3rd Party Payments | Set up 3rd party payees Issuing payments to a 3rd Party (401K, Union Dues, Charitable Contributions) | Up to 3 3rd party payee setups included |
| ☒ General Ledger | Setup of GL reporting. GL setup includes configuration of levels and accounts. Capability to export detail and summary information. GL Export is included under Imports and Interfaces. | |
| ☒ Year End | Generation of W2 and related year end documentation and filings. | |
| ☒ Payroll Production Reports | Creation of payroll production reports and storage of a rolling 36 months of the payroll production reports. These reports are created with the payroll runs and are stored in a non-alterable format. | |

## Dayforce Benefits

| Component | Description | Scope |
|---|---|---|
| ☒ Benefit Plans | Configure health, life & disability, retirement, reimbursement, credit, and sundry benefit plans to match the summary plan definitions. This includes eligibility qualifiers, waiting periods, options, participants, rates, and payroll mappings for each of the plans. | 13 plans included |
| ☒ Enrollment Processes | Configure enrollment processes for open enrollment period(s), life events (e.g. add a dependent), and work events (e.g. promoted into a benefits eligible position) to provide the employee the ability to enroll in benefit offerings | Up to 7 Enrollment Processes |
| ☒ Benefits Management | This feature gives the Benefits Administrator the ability to view and adjust employee enrollments, configure audit reports, and understand the benefit costs and payments to carriers | |
| ☒ Current Year Benefit Elections | Importing of current year elections made by employees | Includes current year elections |

Note that applicable carrier feeds are outlined in the Imports and Interfaces section under Interface Configuration.

## Dayforce Time

| Component | Description | Scope |
|---|---|---|
| ☒ Scheduling | _Manual Scheduling_<br>Managers can create manual schedules for their employees by creating new shifts with desired start and end times. Shifts can be created for each employee or a shift can be created and multiple employees can be assigned to that shift as appropriate.<br><br>_Rotation Based Scheduling_<br>Shift rotations are used to define a pattern of repeating shifts and days off that describe employees' regular work week. For example, Client can define a shift rotation where employees work 5 days, from 9am to 5 pm, followed by 2 days off. Managers assign this rotation to the appropriate employees, rather than scheduling them every week for the same 5 shifts and 2 days off. Shift rotations can be defined for any number of days. | Up to 50 Rotations included |
| ☒ Pay Policy | Pay policies are used to assign pay rules and qualifiers within the application to appropriate employees so that employees are paid correctly. Each pay rule controls an aspect of Client's organization's payroll policy, such as when and how daily, weekly, and holiday overtime is paid, or what shift premiums employees can earn. A pay policy groups the appropriate instances of these pay rules together, so that they can be applied to the same group of employees. | Up to 3 Pay Policies included |

| Component | Description | Scope |
|---|---|---|
| ☒ Punch Policy | Punch policies define an employee's time entry method and any optional rules and validation to be applied when employees record working time.<br>For example, when an employee punches in at the clock, a punch policy can round the time to the nearest quarter-hour, or consider punches that are 5 minutes early or late as being on time.  There are also parameters which define what duration shifts must be in order to qualify for meals or breaks, as well as specifying the duration and number of breaks for qualifying shifts. | Up to 6 Punch Policies included |
| ☒ Employee System Access | Employee level user system access to the following tasks: Availability, Messaging and Alerts, Schedules, Timecard, Webclock, Time Away from Work. | |

### Advanced WFM Modules

| Component | Description | Scope |
|---|---|---|
| ☒ Schedule Bidding | This feature defines how employees are ordered, so that preferred employees are assigned their bids first, define the shifts employees within a bid policy bid on, when the bid sessions occur and how frequently they repeat, as well as details on the number of bid windows within a session and which employees are eligible for each set of windows. | Up to 3 policies included |
| ☐ Vacation Bidding | Vacation Bidding allows employees working shift rotations to bid on the vacation time they want to take and managers to review, edit, if necessary, and approve their selections. | Up to 0 policies included |
| ☐ Overtime Equalization | This feature facilitates the automation of the parameters of the Client's overtime policies. Managers can equalize the amount of overtime each employee has been offered during the current month, last month and year-to-date.  It also displays the amount of offered overtime each employee has accepted and rejected.  The system automatically schedules any employees recorded as having accepted the overtime offer with the created scheduled shift matching the time specified in the overtime offer. | |
| ☐ Labor Budgeting | Deriving a labor budget based on imported KPIs or metrics by defining KPI metadata for My Plan. | |
| ☒ Task Management | This feature is used to mirror your organization's needs and policies. This includes configuring the application to support tasks that impact the schedules of the locations they are assigned to by driving or influencing the labor requirements of locations; securing the tasks users can review and modify; configuring which user roles fulfill each function in the task management process. | Up to 0 tasks included |
| ☐ Labor Forecasting and Assisted Scheduling | Forecasting labor demands based on KPIs or metrics, such as sales or number of transactions, using either a trend of historical averages or moving averages forecasting method; defining data adjustment rules and qualifiers in the forecast policy. | Includes  0 labor model |
| ☒ Labor Forecasting and Optimized Scheduling | An add-on to Labor Forecasting and Assisted Scheduling that enables forecasting of estimated metrics and estimated labor requirements; preliminary allocation of budgeted labor hours; automatic generation of a schedule (including assignment of employees to shifts), and ability for a user to edit the resulting schedule. | Includes 1 labor model |
| ☐ Analytics | This feature is used to monitor your organization's results for a variety of key performance indicators (KPIs), through visual representations on a rolling time basis. This enables managers and other users with access to determine which organizational units, such as regions, districts, or individual locations, are driving results along all KPIs over time. | Up to          included |
| ☐ Projects | This feature support the administration and tracking of projects organization-wide; within My Projects, users can create projects for the organization, define start and due dates, a budget in both hours and a dollar amount, and assign the project to an area of the organization and a set of jobs that can work the project. | Up to          included |
| ☒ Attendance Tracking | Attendance tracking allows for the tracking of attendance incidents such as employees arriving to work late or missing scheduled shifts, how the occurrence of these incidents cause attendance violations, and what actions should be taken for these violations. | Up to 2 policies included |
| ☒ Shift Trading | Shift Trading policies allow control which employees can make shift trades, swaps, or re-trades, and whether they require supervisor approval to do so. | |

Statement of Work

| Component | Description | Scope |
|---|---|---|
| **Platform/Technical** | | |
| ☐ Client Verified Single Sign On | *Provide user authentication with the customer's SAML 2.0 or ADFS Identity Management Solution where the client acts as the identity provider* | |
| **Dayforce Education Services** | | |
| ☒ Dayforce Essentials | *Online videos providing introduction to Dayforce HCM module functionality. In addition to videos available 24/7 for the life of the customer contract, Essentials includes comprehensive training plans and best practice methods for accelerating adoption.*<br><br>*Videos include Essentials Supervisor Operations Overview, Payroll and HR Administration, Scheduling Overview, Dayforce WFM Payroll Administration – HPL, Dayforce WFM Employee System Access and Dayforce WFM Payroll Administration – HR/Payroll Small Business* | |
| ☐ Instructor Led Training | *WFM Supervisor Operations Virtual Class (2.5 hours)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *WFM – Scheduling Virtual Class (1.5 hours)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *WFM – Employee System Access Virtual Class (1 hour)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *WFM – Workforce Management Module 1 (6 hours)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *Payroll Administration and Processing Pay Virtual Class (12 hours)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *Benefits Administration and Plan Development Virtual Class (6 hours)* | Includes up to 0 Students |
| ☐ Instructor Led Training | *Self Service Configuration Virtual Class (2.5 hours)* | Includes up to 0 Students |
| ☐ Client Exclusive Training - Onsite | *Instructor led training delivered exclusively to client, onsite at their location. Instructor expenses are additional* | 0 Onsite Training Days |
| ☒ Client Exclusive Training - Virtual | *Instructor led training delivered exclusively to the client via virtual class*<br>Customer-exclusive virtual WFM system administration -1 day (max of 12 students)<br><br>Customer-exclusive virtual WFM train-the-trainer – 1 day (max of 12 students)<br><br>Customer-exclusive virtual administrator training for Payroll, Benefits and Self Service – 4 days (max of 12 students per day) | Includes 83 Hours |
| ☒ Custom Training | *Customization of standard Dayforce Education offering to incorporate client data and business process examples.*<br>Develop custom training materials for WFM (workbooks and employee job aids) | Includes 53 Hours |

(b)    <u>Out of Scope Work:</u>  Unless a task, duty, responsibility or deliverable is expressly set forth under "(a)In Scope Work" above, it is out of scope and will not be provided or performed by Ceridian as part of the implementation Fees quoted.  Without limiting the generality of this principle, Ceridian and Client expressly confirm that the following specific items are out of scope:
- Integration to 3rd party systems other than those identified  in the HCM Exhibit; and
- Dayforce-lead User Acceptance Testing  (UAT) test case development and execution;
- Training material development outside of the Education Services specified above;
- Client resource and/or third party vendor management.

5.   <u>Assumptions and Client Duties and Responsibilities</u>

The implementation fees and estimated timelines (as set forth below) are based on the following assumptions, and the Client being responsible for the following:

- Client's requirements for the Services being implemented are as set forth in the written discovery questionnaires completed by / for Client;
- Client will provide personnel with the appropriate knowledge of the Client's systems and its configuration to assist in data analysis for HR data import and appropriate exports;
- Client is responsible for overall project and resource management;
- Client will provide solution feedback based on the Requirements Recap provided post Discovery and will sign off on the document. Requirements Recap will be deemed accepted 10 business days after delivery to Client;
- Client will provide data requested by project team in a timely manner;
- Client will staff required personnel and subject matter experts to provide requirements and feedback in a timely manner;
- Client will support parallel run testing with appropriate personnel and reports;
- Client will perform UAT such as developing and executing test scripts, providing test results and steps to reproduce, and determine user acceptance criteria; and
- Client will confirm acceptance and sign-off for all Implementation Services (including UAT) in a timely fashion.
- Any changes to the Services described above will require a Change Order.

**In consideration of the Fees to be paid hereunder, Client hereby requests that Ceridian provide those Implementation Services in accordance with the terms and conditions set forth in this SOW. This SOW may be executed either contemporaneously or subsequent to the Agreement, and in either case the terms of this SOW shall be deemed to be incorporated into and form an integral part of the Agreement. In the latter case where subsequently executed, the Agreement shall be considered amended by adding the provisions of this SOW, and to the extent this SOW does <u>not</u> modify the Agreement, the Agreement shall continue in full force and effect, unamended, and otherwise the execution of this SOW will not serve to revise the relationship between the Parties and any unremedied and outstanding accounts, breaches or other matters existing between the Parties as at the date this SOW is executed will remain intact and subsisting notwithstanding the amendment of the Agreement.**

Dated as of the ___27 th___ day of ___DECEMBER___, 20 _12_ .

**Ceridian Corporation**

Per: ___R. E. Olson___
        (Signature)

Print Name: ___Raymond E. Olson___

Title: ___V.P.___

I have the authority to bind the corporation.

**Chumash Casino Resort Enterprise**

(Client)
Per: ___Clearwater___
        (Signature)

Print Name: ___C. Clearwater___

Title: ___CFO___

I have the authority to bind the corporation/partnership.